**Gregory ROUSTER and Darnell Williams, Appellants (Defendants Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 45S00–8710–CR–914.

Supreme Court of Indiana.

Oct. 16, 1992.

Scott L. King, Daniel L. Bella, Nathanial Ruff, Appellate Public Defenders, Crown Point, for appellants.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

John and Henrietta Rease were foster parents in Gary, Indiana. They were an older couple, John seventy-four and Henrietta fifty-nine. They ran a small candy

store out of the first floor of their home at 2430 Jennings Street, selling chewing gum, cigarettes and other sundries. For a welfare allowance of $160 a month per child, they undertook the responsibility of clothing, feeding and caring for fortuneless children, some of whom had proven incorrigible in their previous surroundings. One such youth was Gregory Rouster, who came from an institution for boys to live with the Reases late in 1985 when he was seventeen.

On the evening of August 12, 1986, John and Henrietta Rease were robbed and shot to death in their home. Police arrested Gregory Rouster and Darnell Williams for the crime, and a jury found them both guilty on two counts of felony murder. Ind.Code § 35–42–1–1(2) (West 1986). Both were sentenced to death. Ind.Code § 35–50–2–9 (West 1986).

Rouster and Williams allege several errors in this direct appeal. Both claim the trial court erred by not holding separate trials for each defendant. Both claim the death sentence is inappropriate. Rouster claims the court abused its discretion by allowing rebuttal argument by Williams' counsel during the guilt and penalty phases of the trial. Rouster also challenges the constitutionality of Ind.Code § 35–50–2–9, alleging that it fails to define the term "recommendation" and that the jury was not instructed about the import of its recommendation on the sentence to be imposed. Williams claims his due process rights were violated when the State introduced evidence on a prior uncharged robbery during the penalty phase of the trial.

We affirm.

### Facts

Jack Baumer, a Lake County welfare department caseworker, testified that he had placed Rouster in the Rease household in November or December 1985. Rouster lived with the Reases until his eighteenth birthday in February 1986. Shortly before 5 p.m. on the day of the murders, Baumer by chance encountered Rouster at a Gary drug store. After recognizing each other, the two had a brief conversation. Rouster asked Baumer about foster home payment procedures. He specifically asked whether the Reases received a clothing allowance on his behalf. Baumer said they did. Rouster declared that the Reases owed him money and that he was going to get it. Baumer testified at trial that a clothing allowance of five or six dollars was included in the $160 monthly payment the Reases received from the welfare department for Rouster's care.

Later that evening, about four hours after the encounter at the drug store, Rouster and Williams, and their girlfriends—Teresa Newsome and Kim Toney—rode a city bus to the neighborhood where the Reases resided. Rouster was wearing a white shirt and printed shorts. Williams wore a blue T-shirt. Newsome was dressed all in white.

Several neighborhood teenagers testified that they saw Rouster and Williams enter the Rease home, and that they heard shots. One of the youths, Eugene Powell, testified that after hearing the shots, he saw Rouster talking to Newsome outside the Rease home. Powell said he heard Rouster tell Newsome, "I killed the motherf——s," and ask Newsome if she "still loved him." Powell further testified that he saw Rouster's "friend" on the ground in front of the house, flicking a cigarette lighter for illumination as he searched for something in the grass. This testimony was corroborated by three other youths, including Jamal Pope, who identified defendant Williams as the man with the lighter, and Jimmy Gray, who heard Williams say "my shells," as he searched the front yard. Pope also testified that Rouster was outside the house talking to Newsome when the last shot was fired.

Gloria Williams, who lived next door to the Reases, heard gunshots and screams coming from the Rease home. She heard someone yell, "Get it. You know where it is. Go get it." From her second-floor window, Gloria Williams could see into the Rease bedroom. Before someone inside the Rease home pulled down the shade, she was able to see objects being tossed about the room. She called police. Looking out

the window a short time later, she saw a young man outside the house say to a girl dressed in white, "You don't love me now."

A neighbor from across the street, Lelia Gray, testified that after hearing noises and cursing coming from the Rease house, she looked out her door and saw two boys wrestling. One was yelling that he "wanted his share." A girl in white wanted busfare to leave. Mrs. Gray then saw the two males go into the house. The one in the white shirt had a gun in his back pocket, she said. She heard gunfire and saw the lights go out in the Rease home. She saw flashes from inside the home. Then the boy in the white shirt came out and told the girl in white that he "killed the mother—f——s ." Mrs. Gray saw the police arrive, and saw them temporarily diverted to a house down the street after a brief conversation with the girl in white.

The police officer so diverted was Rita Dorsey. Dorsey testified that she had been dispatched to the area on a report of shots fired. Upon her arrival, Dorsey asked Newsome where the trouble was. Newsome pointed down the street. As Dorsey continued around the block, she was flagged down by another youth, Derrick Bryant, who told her of the shootings at 2430 Jennings Street. Dorsey went to the house and discovered the bodies of John and Henrietta Rease. Several rooms had been ransacked.

Rouster and Williams were each apprehended a short time later: Rouster on a Gary city bus, Williams in a foot chase with police that included a dash across a busy interstate highway.

Back at the Rease home, police found a .32 caliber handgun in the backyard and a .22 caliber handgun in the house. There were several rounds of .30 caliber ammunition on the floor. Tests showed conclusively that the .32 was used to kill John Rease, who had been shot once near the shoulder. The same gun fired the bullet found in Henrietta's back. Henrietta was also shot twice in the head at point blank range with a .22. Tests showed that the .22 found at the scene could have fired one of the bullets found in Henrietta's brain. The other bullet was too mutilated to provide any clues. The .30 caliber ammunition found spilled at the scene was the same brand found on Williams when he was apprehended. Williams was also found in possession of a pouch containing wristwatches and $232 in cash.

Several packs of cigarettes were found in the Reases' driveway. Fingerprints lifted from two of the packs matched Rouster's. Rouster's white shirt was stained with blood consistent with that of John Rease. The blood on Williams' blue shirt was consistent with that of both victims.

At trial, following the introduction of this physical evidence, the State presented its twenty-ninth and penultimate witness, seventeen year old Derrick Bryant, another foster child of the Reases, who was hiding in the house when the murders occurred. He testified that on the night of the murders, he was in the living room with the Reases at about 9 p.m. He looked out the window and saw Rouster, Williams, Newsome and Toney walking down the street toward the home. The four entered the Rease home and sat down in the living room. Rouster and Henrietta Rease went into a back room. Bryant heard Rouster say to Henrietta that Jack said he was supposed to get some money.

After an angry exchange with Williams, Bryant left the living room and went to a back room of the house. From there he could hear Henrietta asking everyone to leave. He heard Williams tell Rouster, "she's gyping you out of your money." Bryant was able to hear a conversation outside between Williams, Rouster, and another teen named Edwin Taylor. Taylor said "you all have guns ... go take the money." Taylor told Williams and Rouster that the Reases had money on the dresser in their bedroom. Rouster said "let's go rob them." By now, Bryant was hiding upstairs. He tried running downstairs to warn the Reases, but before he could do so, he saw Rouster coming through the front door, so he hid behind a stairway in the back of the house. Bryant heard Williams tell Henrietta to get on the floor. He heard Henrietta plead with Williams not to

hit Mr. Rease because he had a bad heart. Williams replied, "his heart is stronger than mine." Bryant heard Rouster demand to be told "where's the money at?" He heard Rouster tell Williams to "bring both of them back here." Then he heard a noise that he said sounded like someone falling into a wall. He heard Williams say, "it's your time." He heard Rouster say something like "waste them."

Mrs. Rease said, "Greg, why are you doing this." Rouster said, "my name ain't Greg." Bryant heard two shots before he ran out the back door. It was Bryant who eventually flagged down officer Dorsey. On the witness stand, Bryant identified one of the watches found in Williams' pouch as belonging to Henrietta. He said he had given it to his foster mother as a gift.

## I. Severance for Trial

Rouster and Williams allege error in the trial court's failure to try them separately. The governing statute, Ind.Code § 35–34–1–11(b) (West 1986) provides that:

Whenever two (2) or more defendants have been joined for trial in the same indictment or information and one (1) or more defendants move for a separate trial because another defendant has made an out-of-court statement which makes reference to the moving defendant but is not admissible as evidence against him, the court shall require the prosecutor to elect:

(1) a joint trial at which the statement is not admitted into evidence;

(2) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively deleted; or

(3) a separate trial for the moving defendant.

In all other cases, upon motion of the defendant or the prosecutor, the court shall order a separate trial of defendants whenever the court determines that a separate trial is ... appropriate to promote a fair determination of the guilt or innocence of a defendant.

1. Rouster, Williams and Newsome were tried together. Edwin Taylor was also charged but

To trigger the provisions of Ind.Code § 35–34–1–11, a defendant must move for a separate trial before commencement of trial, except in those cases where the motion is based upon a ground not previously known, in which case the motion may be made at the close of evidence. Ind.Code § 35–34–1–12(a) (West 1986). The same subsection further provides that the right to a separate trial is waived by failure to make the motion at the appropriate time. If a defendant's pretrial motion for a separate trial is overruled, the motion may be renewed at the close of evidence. This right, too, is waived by failure to renew the motion. Ind.Code § 35–34–1–12(b).

▆ None of the defendants[1] who were tried together made any pretrial statements, so an election by the prosecutor was not required. Williams nonetheless filed a pretrial motion for a separate trial, alleging in support only that "his interests, rights and his defense hereto [would] be prejudiced if he [were] tried with the remainder of the defendants herein." Record at 50. The motion contained no specific allegations or facts to put the trial court on notice of any mutually antagonistic defenses. Williams' motion was properly denied. He failed to renew it at the close of evidence and thus has waived the issue on appeal. Ind.Code § 35–34–1–12(b), *Smith v. State* (1985), Ind., 474 N.E.2d 973; *Beal v. State* (1983), Ind., 453 N.E.2d 190.

▆ Rouster, too, has waived the separate trial issue, because he failed to file a pretrial motion or make a subsequent motion at the close of evidence as required by statute. Where a defendant fails to request a separate trial, he cannot rely on a codefendant's motion for severance to preserve an error for appellate review. *Morgan v. State* (1980), 272 Ind. 504, 400 N.E.2d 111; *Scott v. State* (1980), Ind.App., 409 N.E.2d 1184.

## II. Final Argument

▆ In arguing for a new trial based on denial of severance, appellants direct our

pled guilty to robbery and became a prosecution witness. Newsome was acquitted.

attention not so much to the evidentiary phase of the trial, but more to the way final argument unfolded. It was during final argument in the guilt phase that Rouster and Williams first began accusing each other. These accusations continued during final argument in the penalty phase.

Following the State's summation in the guilt phase, Williams' counsel spoke first. He told the jury that it was Rouster who had gone "berserk." Rouster's counsel countered in his final argument that "the real maniac was Darnell Williams." He argued that because Williams was twenty years old and Rouster only eighteen at the time of the murders that Williams was the leader. In response to this development, the trial judge allowed Williams a rebuttal argument. Rouster claims on appeal that the trial court abused its discretion by allowing rebuttal argument by his codefendant.

Despite the absence of pretrial motions clearly stating any intentions to advance mutually antagonistic defenses, the trial judge anticipated by trial's end the possibility that the defendants might turn on each other during final argument. He altered his previous plan to allow each defendant forty-five minutes to address the jury and informed Williams and Newsome that they could have an additional fifteen minutes to rebut any aspersions cast their way in Rouster's final argument. Rouster objected on the grounds that it was unfair to allot more time to his codefendants. The trial judge attempted to assuage his concerns by offering him additional time. The judge said: "Well, what if during the course of your final presentation I perceive that you have turned on either Newsome or Williams and by some signal then give you an additional fifteen minutes, would that be satisfactory?" Record at 2462–63. Rouster's counsel still objected, stating, "[w]e feel the codefendant should not have the opportunity to rebut anything that we have to say." Record at 2463. The judge then ruled that he would take his glasses off and place them on the bench in front of him

to signal Rouster's counsel that he had an additional fifteen minutes. This in fact occurred, and each defendant was thus allotted an equal amount of time for final argument. Record at 2592.[2]

■ Control of final argument is assigned to the discretion of the trial judge. Unless there is an abuse of this discretion clearly prejudicial to the rights of the accused, the ruling of the trial court will not be disturbed. *Jenkins v. State* (1975), 263 Ind. 589, 335 N.E.2d 215; *Kallas v. State* (1949), 227 Ind. 103, 83 N.E.2d 769, *cert. denied*, 336 U.S. 940, 69 S.Ct. 744, 93 L.Ed. 1098. Although the trial court's action in this case was unusual, it was plainly within his discretion. Each defendant was allotted equal time; each was given a chance to rebut any argument by a codefendant that pointed toward his guilt. Rouster, by virtue of going second, had the chance to hear his codefendant's argument before addressing the jury. The trial judge merely gave Williams the same opportunity. We fail to see how this was prejudicial to Rouster.

### III. Constitutionality of the Statute

■ Rouster argues that the Indiana death penalty statute, Ind.Code § 35–50–2–9, is unconstitutional; he contends it violates the Eighth Amendment because it does not define the term "recommendation." The jury, therefore, was not instructed about the import of its recommendation on the sentence to be imposed. These alleged defects, Rouster argues, may have led the jury to believe that responsibility for the life or death decision rested elsewhere, thereby undermining the heightened need for reliable determinations in death penalty cases required by the Eighth Amendment. *See Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). We rejected this identical claim in *Canaan v. State* (1989), Ind., 541 N.E.2d 894, *cert. denied*, — U.S. —, 111 S.Ct. 230, 112 L.Ed.2d 185 (1990), and likewise reject it here.

---

**2.** Rouster asserts the trial court erred by following the same procedure for final argument during the penalty phase. This contention is waived for failure to object.

*IV. Use of Prior Uncharged Robbery in Penalty Phase*

During the death penalty phase of the trial, the State introduced evidence that Williams participated in the armed robbery of a seventy-one year old man named James Jackson. Jackson was beaten and robbed by three assailants who broke into his house about a month before the Reases were murdered. Williams had not been charged with the Jackson robbery at the time of his trial for robbing and killing the Reases.

Evidence of Williams' participation in the Jackson robbery was offered and admitted, over defendant's objection, for the purpose of disproving the statutory mitigating factor of "no significant history of prior criminal *conduct.*" Ind.Code § 35–50–2–9(c)(1) (emphasis added). Williams claims on appeal that our decision in *State v. McCormick* (1979), 272 Ind. 272, 397 N.E.2d 276, prohibits the State from attempting to prove an independent crime during the penalty phase. To allow otherwise, Williams argues, would violate due process by heightening the possibility of arbitrary or capricious recommendations by death penalty juries.

In *McCormick,* this Court held that the State could not use a prior *unrelated* murder not yet reduced to conviction as a statutory aggravating factor in the death penalty phase. Justice Pivarnik wrote for the Court:

We hold that Ind.Code § 35–50–2–9(b)(8) is unconstitutional as applied to this defendant. The procedure to be utilized in this case as provided for by statute and case law will be, in fact, two trials. The defendant will first be tried to a jury for the killing of Douglass Overby. If he is convicted, a sentencing hearing will take place. At this sentencing hearing, the defendant will, in essence, be tried for the murder of Harold Lewis. This hearing will be before the same jury which will have just recently convicted the defendant of another, unrelated murder. The trial court noted that if McCormick were tried in an actual criminal trial for the murder of Harold Lewis, any evidence relating to the Overby killing would be inadmissible in the State's case in chief. Likewise, no evidence of the Lewis killing may be admitted in this case in the trial of Count I, the Overby killing. Thus, the effect of the statutory procedure in the present case is obvious: defendant McCormick would be fully tried on two separate, unrelated charges before the same jury. He would be tried on the second count to a jury which has been undeniably prejudiced by having convicted him of an unrelated murder. As the trial court pointed out in its ruling: "... This opens the door to death penalty recommendations upon a level of proof lower than beyond a reasonable doubt."

*McCormick,* 272 Ind. at 278, 397 N.E.2d at 280.

Williams asserts that "the rationale of this Court in *McCormick* applies with at least equal force to the facts of the present case." Appellant's Brief at 74. His interpretation of *McCormick,* however, is too broad. As Justice Pivarnik wrote at the conclusion of the majority opinion, "our holding is *confined* to those cases in which the murder alleged as an aggravating circumstance is not related to the principal murder charge." *Id.,* 272 Ind. at 280, 397 N.E.2d at 281 (emphasis added).

The holding in *McCormick* was motivated by the fact that our death penalty statute requires aggravating factors be proven *beyond a reasonable doubt.* Ind.Code § 35–50–2–9(a). The concern reflected in Justice Pivarnik's opinion was plain: a death penalty jury could be prejudiced to the point where it might determine an aggravating circumstance on lesser proof.

This danger is much reduced when a jury considering the death penalty assesses the presence of mitigators, which need only be established by a preponderance. Similarly, when a jury makes its ultimate determination of whether to recommend the death penalty, it need only find that the aggravating circumstances *outweigh* the mitigating circumstances. Ind.Code § 35–50–2–9(e). The jury is not required to reach this conclusion *beyond a reasonable doubt. Dan-*

*iels v. State* (1983), Ind., 453 N.E.2d 160, 171. The weighing of aggravating and mitigating factors is not equivalent to a trial on guilt or innocence. Therefore, the due process guarantees insured by *McCormick* are not implicated in the case at bar, and *McCormick* does not preclude the State from offering evidence of independent crimes to disprove the lack of significant prior criminal conduct. Ind.Code § 35–50–2–9(c)(1). The trial court did not err in admitting evidence of Williams' prior criminal acts.

## V. Imposition of Sentence

Both Williams and Rouster claim that the evidence and the findings of the trial court are inadequate to support the death penalty.

As to Rouster, the trial judge made written findings that the State had proved beyond a reasonable doubt that Rouster committed murder by intentionally killing John Rease while committing the crime of robbery against John Rease and Henrietta Rease. He further found that Rouster had committed murder by intentionally killing Henrietta Rease while committing a robbery, and that Rouster had committed multiple murders by killing John and Henrietta.

The judge examined each possible mitigating circumstance provided in Ind.Code § 35–50–2–9 and he found as follows:

1. Standard: The defendant has no significant history of prior criminal conduct. Facts: As a juvenile the defendant was adjudicated for two burglaries in 1982 and for violation of probation in 1984. As an adult he was charged in Lake County Division I for conversion.

2. Standard: The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder. Facts: The killings were done in a deliberate fashion. Though there is some indication that Rouster thought he was suffering an injustice, this had no basis in fact. It was a pretext to give the appearance of justification for killing.

3. Standard: The victim was a participant in, or consented to, the defendant's conduct. Facts: From the evidence previously referred to, we conclude the victims acceded to the robbery to avoid the killings, but were completely at the defendant's mercy.

4. Standard: The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor. Facts: Rouster planned the robbery with Williams. Both were well known to the Reases. It is reasonable to conclude that once the robbery plan was carried out the Reases could not be permitted to identify either Rouster or Williams. Rouster additionally was the one announcing that he had killed them both.

5. Standard: The defendant acted under the substantial domination of another person. Facts: Both Rouster and Williams acted as a team. It was Rouster who said: "Let's get them now." He was equal partner and not under anyone's domination.

6. Standard: The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication. Facts: Rouster is mentally alert and was capable of making A's and B's in high school in subjects such as English, General Mathematics, American History and General Science. There is no indication of mental disease or defect. There was evidence that Rouster had been drinking that evening. He was, however, able to deceive the arresting officer as to his prior locations that evening and had the presence of mind to duck down in the bus when the police car went by.

7. Standard: Any other circumstances appropriate for consideration. Facts: Under this standard there are none. The defendant, Rouster, is a nineteen (19) year old male, well-formed of statute, physically strong and mentally alert. His lack of family support and traditional human relationships, though a factor in his antisocial behavior, cannot

excuse that conduct as resulting from a social disorder or medical disease. The Court also notes that Rouster was eighteen (18) years of age at the time of the murders. A young age is always a mitigating factor, though not ennumerated by statute. A person of tender age makes impulsive choices, often unwise, that someone of greater experience and years would not make. Had this been the first or second bad decision, his age would have been a substantial mitigating factor. But Rouster has consistently made bad decisions. He has been subjected to corrective treatment. He has been given time to reflect. He has had his environment changed. He has had the benefit of supervision at all levels of his development. It has had no deterrent effect. Record at 146–47.

The record supports the trial court's conclusion that the aggravating circumstances were proven beyond a reasonable doubt. Indeed, Rouster concedes in his brief that the State presented evidence sufficient to prove the aggravators. He contends, however, that mitigating circumstances exist which are not outweighed by the aggravating circumstances and thus the death penalty should not be imposed. He points to facts in the record detailing the unfortunate childhood which he endured: born to a fourteen year old prostitute, abandoned at birth, raised as a ward of the state, shuttled from foster homes to institutions, more than a dozen different living arrangements in eighteen years.

The jury heard this evidence before making its recommendation that Rouster receive the death penalty for robbing and killing his elderly foster parents. There are indications in the record that the trial judge also considered Rouster's history in reaching his decision. The judge concluded, however, that "[Rouster's] lack of family support and traditional human relationships, though a factor in his antisocial behavior, cannot excuse that conduct ..." Record at 147. The court then found that the aggravating circumstances predominated. The evidence supports this conclusion about the relative weight of all the circumstances and thus the decision regarding the penalty to be imposed on Rouster.

■ Williams, too, argues that the trial court erred in imposing the death penalty. He contends that the State did not sufficiently establish his direct involvement in the robbery and killing of the Reases to justify the sentence. The essence of his claim is that the State did not prove he was a triggerman in the deaths of John and Henrietta Rease. He directs us to *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

In *Enmund*, the Supreme Court reversed the death sentence of a prisoner convicted under Florida's felony murder rule. Enmund was the driver of the "getaway" car in an armed robbery of an elderly couple at their farmhouse. The elderly couple resisted and Enmund's accomplices killed them. The Court held that the death penalty for Enmund violated the Eighth Amendment because "Enmund himself did not kill or attempt to kill"; there was no proof that Enmund had any intention of participating in or facilitating a murder. *Id.* at 798, 102 S.Ct. at 3377. The rule gleaned from *Enmund*, however, has since been refined in *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). "[M]ajor participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 158, 107 S.Ct. at 1688.

At the very least, the facts clearly show that Williams' participation in the felonies was major and that his conduct displayed reckless indifference to human life. Thus, the State has demonstrated the level of culpability required by the Eighth Amendment.

■ The trial judge made extensive findings concerning the penalty on Williams. He found as aggravating circumstances that Williams committed the murders while committing the crime of robbery, and that Williams committed multiple murders. He found as a mitigating circumstance that Williams had no significant history of prior criminal conduct. Reviewing

the remainder of statutory mitigating factors, the judge found as follows:

2. Standard: The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder. Facts: The killings were done in a deliberate fashion. Though there is some indication that co-defendant Rouster thought he was suffering an injustice, this had no basis in fact. It was a pretext to give the appearance of justification for killing. Williams was not emotionally involved in this matter purely personal to Rouster.

3. Standard: The victim was a participant in, or consented to, the defendant's conduct. Facts: From the evidence previously referred to, we conclude the victims acceded to the robbery to avoid the killings, but were completely at the defendant's mercy. They had no capacity for further resistance.

4. Standard: The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor. Facts: Rouster planned the robbery with Williams. Both were well-known to the Reases. It is reasonable to conclude that once the robbery plan was carried out the Reases could not be permitted to identify either Rouster or Williams. It is also significant that blood spots on Rouster's clothing appeared on the back of his garments and on the front of Williams' shorts.

5. Standard: The defendant acted under the substantial domination of another person. Facts: Both Rouster and Williams acted as a team. It was Williams who said: "Don't let them do you this way, you know they owe you." He was goading Rouster. He was equal partner and not under anyone's domination.

6. Standard: The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication. Facts: Williams is mentally alert and a competent high school graduate. There is no indication of mental disease or defect. There was evidence that Williams had been drinking that evening. He was, however, able to deceive the arresting officer and nimbly avoid him across a very busy interstate highway. He was the one to leave the Reases with the bulk of robbery proceeds.

7. Standard: Any other circumstance appropriate for consideration. Facts: Under this standard there are none. The defendant, Williams, is a twenty (20) year old male, tall, physically strong and mentally alert. He was the eldest of the four (4) originally charged. He, by reason of education and maturity was the intellectual leader of the group. Though young, he has exceeded the age that this court considers immature. In this defendant, the court finds nothing in mitigation by reason of age. Record at 186A–87A.

The court then concluded that the aggravating circumstances outweighed the mitigating circumstances and imposed the death sentence. The record supports the judge's conclusion. The death penalty as provided under Indiana statutes was not arbitrarily or capriciously imposed upon Williams and is reasonable and appropriate in his case.

The trial court is affirmed.

GIVAN, DICKSON and KRAHULIK, JJ., concur.

DeBRULER, J., concurs and dissents with opinion.

DeBRULER, Justice, concurring and dissenting.

I would affirm the convictions of Rouster and Williams on two counts each of felony murder, but set aside the penalty of death as to each and remand for the assessment of terms of years.

Review by this Court of the sentence of death is mandatory, automatic, and cannot be waived. *Cooper v. State* (1989), Ind., 540 N.E.2d 1216. This review includes consideration of whether the procedure before the jury and court by which the penalty has been imposed accords with the dictates of the sentencing statute, and whether the

evidence renders the sentence appropriate. *Vandiver v. State* (1985), Ind., 480 N.E.2d 910; *Benirschke v. State* (1991), Ind., 577 N.E.2d 576.

Here, the sentencing court was in error in giving weight to three separate death aggravators, i.e., 1) the intentional killing of Mrs. Rease while robbing, 2) the intentional killing of Mr. Rease while robbing, and 3) the double murder of the Reases. At the time of instructing the jury, and in arriving at its own sentence, the trial court concluded that the double murder aggravator rested upon the two felony murder convictions and required no proof of an intent to kill. In my opinion this was error. The aggravator in I.C. 35–50–2–9(b)(7), "has been convicted of another murder," and the aggravator in I.C. 35–50–2–9(b)(8), "committed another murder," each employing the term "murder," create at least an ambiguity of meaning. They should therefore be construed strictly to encompass only intentional murder and not felony murder. Such a construction would also aid in conforming the Indiana capital sentencing process to the eighth amendment requirements of a highly culpable mental state. *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

In evaluating the remaining valid aggravators, one finds that in addition to the worsening elements identified in the majority opinion, two ameliorative ones emerge from the record. The first is that the Reases were both armed and both received a form of warning when appellants yelled angrily and fired twice outside the house before entering the second time and employing deadly force. The second is that, rightly or wrongly, appellant Rouster believed the Reases had not provided him with the six dollar portion of the monthly support payments intended for his clothing. The trial judge concluded that this claim was a pretext indulged in by appellant to disguise his evil intent. I do not find this conclusion supported by the record. Appellant Rouster clearly planned this robbery over a period of time and had the intent to rob, i.e., to take that which did not belong to him. Such an intent does not preclude the existence of an intent also to get even for a perceived injury. To conclude as the trial judge did, that appellant Rouster did not truly indulge this perception of injury, is to reject what is plainly shown by this record. He asked his former welfare worker about it. He confronted his former foster parents with the claim and persisted in it. He permitted himself then, though armed, to be thrown out of the house. Accordingly, I find that the weight of these two aggravators is in the middle range.

With respect to mitigating circumstances, the trial judge concluded that there were none with respect to appellant Rouster which were entitled to the least weight, saying, "The Court finds nothing in mitigation." (Record at 148) With respect to appellant Williams, the court granted weight to one mitigating circumstance, namely no prior criminal conduct. Williams is entitled to additional mitigating value for his regular employment and the aid and acts of kindness which he consistently gave to members of his family. Rouster is entitled to additional mitigating value because of his youth and the unstable environment in which he grew up, and could not develop. Rouster was a normal, black, male child who was made a ward of the court when discharged from the hospital at age 7 days. He remained in that status until his 18th birthday. His adoption was never sought. His first placement in Gary with a foster couple was disrupted at age 5. His second placement in Indianapolis with a single parent foster family was disrupted at age 9. He had a speech defect and stuttered. Before reaching the Reases at age 17, he was then moved through six institutional placements and found to fall in the following categories: mildly mentally ill, emotionally disturbed, needing therapy at Tri–City Mental Health, could develop in a stable home environment to average if encouraged to develop his intellectual and school abilities, underachievement in school, stealing, group delinquent behavior, excessive alcohol intake, and poly-drug usage (cocaine, LSD, & marijuana).

In sum, for the purpose of deciding whether death or long term imprisonment

is appropriate in these cases, I find that the aggravating and mitigating circumstances are evenly balanced. Accordingly, my vote is to set aside both sentences of death.