



FILED

Nov 21 2025, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N T H E

# Court of Appeals of Indiana

Billy G. Luke,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

November 21, 2025

Court of Appeals Case No.
24A-CR-2668

Appeal from the Dearborn Circuit Court

The Honorable James D. Humphrey, Senior Judge

Trial Court Cause No.
15C01-2205-F4-000010

**Opinion by Judge Felix**
Judges Brown and Scheele concur.

**Felix, Judge.**

## Statement of the Case

More than a decade ago, Billy Luke was incarcerated for exposing himself to T.C., who worked at a pharmacy near Luke's house. Over the next few years, Luke continued to harass T.C., leading to further incarceration. Despite several no contact orders issued to protect T.C., Luke sent her dozens of letters and cards from prison that were rife with vulgar sexual language and threats of violence to her and her family. Luke was found guilty of multiple counts of stalking as Level 4 felonies and invasion of privacy as Level 6 felonies, and he was sentenced to 61.5 years in prison. Luke now appeals and raises four issues for our review, which we restate as follows:

1. Whether the trial court erred by denying Luke's motion to dismiss the stalking charges;
2. Whether the trial court erred by denying Luke's motion to sever the charges;
3. Whether sufficient evidence supports Luke's convictions for invasion of privacy; and
4. Whether Luke's sentence is unconstitutionally disproportionate.

We affirm.

## Facts and Procedural History

### Background Facts

In 2012, T.C. worked at a pharmacy in Dillsboro, Indiana. Luke's house was across the street, and for several months when T.C. would pull into the parking lot, Luke would "be standing in the window, naked and masturbating." Tr.

Vol. VI at 84. Following a jury trial at which T.C. testified, Luke was convicted of public indecency, was sentenced to prison, and was ordered to have no contact with T.C.

[4] After Luke's release from prison, Luke would spend hours outside his house "star[ing]" at T.C. and her female coworkers in the pharmacy. Tr. Vol. VI at 86. Luke vandalized the pharmacy windows and T.C.'s vehicle. Despite the no contact order, Luke also attempted to write T.C. a letter. This behavior led to convictions for attempted invasion of privacy[1] and criminal mischief[2], and an additional no contact order was issued.

[5] Persistent, Luke continued to sit outside and stare at T.C. and her coworkers from his driveway. Luke was convicted of several counts of invasion of privacy and again ordered to serve time in prison.[3]

[6] While in prison, Luke sent T.C. a "prolific quantity" of letters, cards, and books. *Luke v. State*, 149 N.E.3d 674, No. 19A-CR-2229, slip op. at ¶ 4 (Ind. Ct. App. June 3, 2020) (mem.), *trans. denied*. In 2018, the State filed stalking charges against Luke in Cause 15C01-1812-F5-000090 (the "2018 Case") for violating the no contact order by sending the letters to T.C. The trial court issued another no contact order during the initial hearing to prevent Luke from

---

[1] Cause 15D02-1307-CM-000564.

[2] Cause 15C01-1402-FC-000019; *see also Luke v. State*, 51 N.E.3d 401 (Ind. Ct. App. 2016), *trans. denied*.

[3] Cause 15D02-1401-FD-000011.

having contact with T.C. until Luke's trial and sentencing concluded (the "2018 No Contact Order").

[7] Luke was eventually found guilty of several counts of stalking in July 2019.[4] Before Luke was sentenced, he wrote an additional letter to T.C. from prison. The trial court then sought to issue a new no contact order that would be in force after Luke was sentenced (the "2019 No Contact Order"), but Luke refused to sign it. Because Luke refused to sign the order, the trial court read it aloud to Luke during Luke's sentencing hearing. The trial court then asked if Luke understood the order, and Luke responded, "Understand what?" Ex. Vol. VI at 149. The trial court replied, "That's about the response that I expected from you. . . . [O]nce again, you're failing to cooperate, and again, the Court's noted for the record, [the 2019 No Contact Order is] in [Luke's] presence, he's heard it, and he won't acknowledge it." *Id*. Luke was again sentenced to serve time in prison.

**Current Facts**

[8] On January 1, 2020, while Luke was in prison, he sent a letter to himself that purported to be from T.C. The letter purported that the 2019 No Contact Order had been "terminated" and that it would be "perfectly legal" for Luke to write to T.C.; Luke would "not be arrested or anything." Ex. Vol. VI at 154. Luke

---

[4] Luke was found guilty of one count of harassment, as a lesser included offense of stalking; three counts of stalking; and one count of invasion of privacy; however, the trial court only entered judgments of conviction on the three stalking counts due to double jeopardy concerns. *Luke*, 149 N.E.3d 674, No. 19A-CR-2229, slip op. at ¶ 7.

then wrote a letter to T.C., stating, "I am so glad you looked in to [sic] the no-contact order thing. I am glad that the no-contact order is not valid and has in fact been terminated. Now I can write my love with peace of mind that laws are not violated and no consequence possibly entails." *Id*. at 157.

[9] Over the next two years, Luke sent numerous letters, cards, and books to T.C. from prison. Luke mentioned finding photographs of T.C. on social media, searching for her home using Google Maps, and being able to break into her garage. He made eerie references to movies and songs about stalkers and serial killers, reminded T.C. of the date of his release from prison, and promised to make her "famous" when that time came, Ex. Vol. V at 36. He also threatened to harm T.C. and members of her family and unleash the "Luke gestapo" on the town of Dillsboro. Tr. Vol. III at 178. The letters "terrified" T.C. Tr. Vol. VII at 55.

[10] In May 2022, the State initially charged Luke with one count of stalking as a Level 4 felony[5] and one count of invasion of privacy as a Level 6 felony[6]. The trial court issued an additional no contact order following Luke's initial hearing, which Luke signed (the "2022 No Contact Order"). Luke, however, continued to send letters and cards to T.C. from prison. The State amended the charging information several times and ultimately charged Luke with 2 counts

---

[5] I.C. 35-45-10-5(a), (c)(2).

[6] I.C. 35-46-1-1.51(a)(12).

of stalking as Level 4 felonies and 32 counts of invasion of privacy as Level 6 felonies. The first stalking charge was based on the letters sent between January 1, 2020, and June 1, 2021, and the second stalking charge was based on the letters sent between March 28, 2023, and June 12, 2023. One of the invasion of privacy counts was based on Luke's violation of the 2018 No Contact Order, 26 were based on Luke's violations of the 2019 No Contact Order, and 5 were based on Luke's violations of the 2022 No Contact Order.

[11] Luke then filed a motion to sever the charges such that each stalking charge would be tried individually with its corresponding invasion of privacy charges. Luke argued that the jury would find him guilty based on the "cumulative evidence," Appellant's App. Vol. VI at 161–62, and would infer that "guilt of one crime in a series of acts proves [Luke] is guilty of other acts in the series," *id*. at 162. Luke also filed a motion to dismiss the stalking charges on the grounds that the "stalking [statute] is unconstitutionally vague." *Id*. at 163. The trial court denied both motions following a hearing. Luke then filed a motion "for dismissal/acquittal" of the charges on the grounds that he was never "notified" of the 2019 No Contact Order, Appellant's App. Vol. VII at 134, which the trial court also dismissed. Luke waived his right to a jury trial during a pretrial hearing held on July 15, 2025.

[12] Thereafter, Luke, pro se, proceeded to a bench trial. Following the State's case in chief, Luke renewed his motion for "dismiss[al] and "acquittal," Tr. Vol. VIII at 115, which the trial court again denied. Luke then testified in his own defense—he admitted that he wrote the letters to T.C. but argued that he could

not be found guilty of invasion of privacy because he did not know about the 2019 No Contact Order. The trial court found Luke guilty as charged.

[13] Before sentencing, the State filed a motion to dismiss all the invasion of privacy charges regarding the 2022 No Contact Order and 13 of the charges regarding the 2019 No Contact Order, which the trial court granted. The trial court therefore entered convictions on the 2 stalking charges, 1 invasion of privacy charge regarding the 2018 No Contact Order, and 14 of the invasion of privacy charges regarding the 2019 No Contact Order. The trial court ordered Luke to serve consecutive sentences of 12 years on each of the two stalking convictions and 2.5 years on each of the 15 invasion of privacy convictions for a total sentence of 61.5 years in prison. This appeal ensued.

## Discussion and Decision

### 1. The Trial Court Did Not Abuse Its Discretion by Denying Luke's Motion to Dismiss the Stalking Charges

[14] Luke first argues that the trial court erred by refusing to dismiss the two stalking charges on the grounds that the statute defining the offense of stalking is unconstitutionally vague. We generally review a "ruling on a motion to dismiss a charging information for an abuse of discretion." *State v. Katz*, 179 N.E.3d 431, 440–41 (Ind. 2022) (quoting *Gutenstein v. State*, 59 N.E.3d 984, 994 (Ind. Ct. App. 2016), *trans. denied*). Here, however, Luke challenges the constitutionality of the stalking statute, which is "a pure question of law we review de novo." *Id*. at 441 (quoting *Horner v. Curry*, 125 N.E.3d 584, 588 (Ind. 2019)).

[15] "Due process principles advise that a penal statute is void for vagueness if it does not clearly define its prohibitions, and one such source of vagueness is if the statute lacks notice enabling ordinary people to understand the conduct that it prohibits." *State v. S.T.*, 82 N.E.3d 257, 259 (Ind. 2017) (quoting *Tiplick v. State*, 43 N.E.3d 1259, 1262 (Ind. 2015)). "To that end, there are two independent causes to invalidate a statute on vagueness grounds: (1) the statute does not provide 'notice enabling ordinary people to understand the conduct that it prohibits'; and (2) the statute potentially 'authorizes or encourages arbitrary or discriminatory enforcement.'" *Tiplick*, 43 N.E.3d at 1262 (quoting *Brown v. State*, 868 N.E.2d 464, 467 (Ind. 2007)). "[T]here must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur." *Brown*, 868 N.E.2d at 467 (quoting *State v. Downey*, 476 N.E.2d 121, 123 (Ind. 1985)).

[16] When adjudicating "[v]agueness challenges to statutes not threatening First Amendment interests"—such as the stalking statute here—we examine the statute "in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Morgan v. State*, 22 N.E.3d 570, 574 (Ind. 2014) (alteration in original) (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)). "The statute 'need only inform the individual of the generally proscribed conduct, [and] need not list with itemized exactitude each item of conduct prohibited.'" *State v. Lombardo*, 738 N.E.2d 653, 656 (Ind. 2000) (alteration in original) (quoting *Downey*, 476 N.E.2d at 122).

[17] Luke specifically argues that "[t]he statutory definition [of stalking] is extraordinarily broad and insufficient, as applied to" him because the statute does not provide sufficient "notice that writing a letter or a card is sufficient to constitute stalking." Appellant's Br. at 23. Luke further suggests his letter-writing campaign is "reasonably viewed as trivial conduct." *Id.* (citing *Brown v. State*, 868 N.E.2d 464 (Ind. 2007)). For purposes of Indiana Code section 35-45-10-5, under which Luke was charged, "stalk" means "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened."[7] Ind. Code § 35-45-10-1. "Harassment" is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." *Id.* § 35-45-10-2.

[18] In *Johnson v. State*, 648 N.E.2d 666, 670 (Ind. Ct. App. 1995), this court held that the stalking statute was not void for vagueness because it contained (1) an objective fear standard for the victim, (2) an intent requirement for the defendant, and (3) a requirement that the defendant engage in repeated conduct. The court held that these requirements provided an "intelligible

---

[7] Stalking is a Level 4 felony when "the person has an unrelated conviction for an offense under this section against the same victim or victims," Ind. Code § 35-45-10-5(c)(2), which is the case here.

enforcement standard for those charged with enforcing the statutes," *id.* (citing *Price v. State*, 622 N.E.2d 954, 967 (Ind. 1993)), and "militate[d] against arbitrary enforcement," *id.* In sum, the requirements "indicate where the line is to be drawn between trivial and substantial things so that erratic arrests for trivial acts and omissions will not occur." *Id.* (citations omitted); *see also Pittman v. State*, 45 N.E.3d 805, 816–17 (Ind. Ct. App. 2015) (applying *Johnson*'s reasoning to the crime of attempted stalking).

[19] Here, Luke's letters were replete with vulgarity, psychological gaslighting, and open violent threats. Luke sent dozens of these letters despite numerous no contact orders being imposed. Although the stalking statute does not specifically provide that writing letters can constitute stalking, the statute covers any "course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. Luke's letters were clearly intended to harass and terrorize T.C. for testifying against him and to intimidate her from doing so in the future; they clearly constitute a "course of conduct" contemplated under the stalking statute, and any ordinary person would understand this conduct was proscribed.

[20] In sum, the stalking statute does not lack "notice enabling" Luke to understand that his letters would constitute stalking. *S.T.*, 82 N.E.3d at 259 (quoting *Tiplick*, 43 N.E.3d at 1262). The statute, thus, is not unconstitutionally vague

as applied to Luke, and the trial court did not abuse its discretion by denying Luke's motion to dismiss the stalking charges.

## 2. The Trial Court Did Not Abuse Its Discretion by Declining to Sever the Stalking Charges from the Invasion of Privacy Charges

Next, Luke argues that the trial court erred by denying his motion to sever the charges such that each stalking charge would be tried individually with its corresponding invasion of privacy charges. As an initial matter, Luke's argument that the trial court erred by denying his motion for severance is waived. Indiana Code section 35-34-1-12(b) provides that a motion for severance denied before trial is "waived" if not "renewed" during trial. Luke did not renew his motion to sever after it was denied by the trial court, so he has waived the issue for our review. *See Rouster v. State*, 600 N.E.2d 1342, 1346 (Ind. 1992).

Waiver notwithstanding, the trial court did not err by denying Luke's motion for severance. Indiana Code section 35-34-1-11(a) governs motions for severance and provides that a defendant has a right to severance of charges if the charges "have been joined . . . solely on the ground that they are of the same or similar character." "In all other cases," the trial court "shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense" based on certain factors. *Id*.

[23] "The degree of deference owed to a trial court's ruling on a motion for severance depends on the basis for joinder" of the offenses:

> Where the offenses have been joined *solely* because they are of the same or similar character, a defendant is entitled to severance as a matter of right. Ind. Code § 35-34-1-11(a) (2008). The trial court thus has no discretion to deny such a motion, and we will review its decision de novo. *Jackson v. State*, 938 N.E.2d 29, 36 (Ind. Ct. App. 2010)[, *trans. denied*]. But where the offenses have been joined because the defendant's underlying acts are connected together, we review the trial court's decision for an abuse of discretion. *Craig v. State*, 730 N.E.2d 1262, 1265 (Ind. 2000).

*Pierce v. State*, 29 N.E.3d 1258, 1264 (Ind. 2015) (emphasis in original). In determining whether joined offenses are connected by the defendant's "underlying acts" and are not merely of the "same or similar character," *id.*, "we ask whether the operative facts establish a pattern of activity beyond mere satisfaction of the statutory elements," *id.* at 1266. A defendant's "modus operandi" and "motive" are relevant to determining whether charges are connected by the defendant's underlying acts and are not merely similar in character based on the statutory elements. *Id.*

[24] Luke argues that the charges "were linked together solely on the ground that they were similar in character" and "were not a series of connected events," Appellant's Am. Br. p. 25, so we review the trial court's ruling de novo, *Pierce*,

29 N.E.3d at 1264.[8] Here, the charges were all based on Luke sending letters and cards to T.C. from prison and were united by his "motive" of harassing her due to his belief that he was wrongfully imprisoned. *See Pierce*, 29 N.E.3d at 1266. The charges were connected by Luke's "underlying acts," *id.* at 1264, not merely the "statutory elements", *id* at 1266, so Luke was not entitled to severance as a matter of right. Moreover, Luke's concerns that a "jury" would be "confus[ed]" and "convict based upon the cumulative evidence," Appellant's App. Vol. VI at 161–62, is mitigated by the fact that he was tried before the bench. Accordingly, the trial court did not err by denying Luke's motion for severance.

### 3. The State Presented Sufficient Evidence to Support Luke's Convictions for Invasion of Privacy

[25] Luke next argues that the trial court erred by denying his motion for "dismissal/acquittal", Appellant's App. Vol. VII at 134, which Luke renewed at trial following the State's case-in-chief. Luke frames the issue as whether the trial court erred by denying his motion for a "directed verdict." Appellant's Am. Br. at 25.

---

[8] Luke does not argue that he was entitled to severance in order to "promote a fair determination of [his] guilt or innocence of each offense," I.C. 35-34-1-11(a)—the other grounds for severance, which we would review for abuse of the trial court's discretion—so any such argument is waived, and we will not address it, *see* Ind. Appellate Rule 46(A)(8)(a) (requiring that appellant's brief be supported by "cogent reasoning"); *Miller v. Patel*, 212 N.E.3d 639, 657 (Ind. 2023).

Luke, however, presented evidence after the trial court's denial of his motion. A defendant "waive[s] his right to appeal" the denial of a motion for directed verdict "by presenting evidence after the trial court denie[s] [the] motion." *Delagrange v. State*, 5 N.E.3d 354, 356 n.1 (Ind. 2014) (citing *Jordan v. State*, 691 N.E.2d 487, 489 (Ind. Ct. App. 1998)); *see also Davidson v. State*, 580 N.E.2d 238, 242 (Ind. 1991) ("A defendant who offers his own evidence after the trial court denies the motion for judgment on the evidence . . . is precluded from challenging that denial."). Thus, even if Luke's motion constitutes a motion for a directed verdict, any challenge to the trial court's denial thereof is waived.

Nonetheless, we will address Luke's challenge as one to the sufficiency of the evidence supporting his invasion of privacy convictions. *See Delagrange*, 5 N.E.3d at 356 n.1 (explaining that any challenge to denial of directed verdict would be waived and addressing the challenge as one regarding the sufficiency of the evidence); *Cox v. State*, 19 N.E.3d 287, 290 n.5 (Ind. Ct. App. 2014) (holding that, when a challenge to denial of motion for a directed verdict is waived, the appellate court may "analyze the argument as a sufficiency claim" (citations omitted)). Addressing Luke's argument as a sufficiency challenge is appropriate because Luke essentially argues that the State failed to prove that he knowingly violated the 2019 No Contact Order.[9]

---

[9] In his Appellant's Brief, Luke argues only that he had no knowledge of the 2019 No Contact Order, upon which all but one of his invasion of privacy convictions were based. This other invasion of privacy charge was based on Luke's violation of the 2018 No Contact Order. Luke, however, makes no argument regarding the invasion of privacy charge for violating the 2018 No Contact Order, so any such argument is waived, and

[28] Our standard of review for sufficiency of evidence claims is as follows:

> "A conviction is supported by sufficient evidence if 'there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (quoting *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015)). This Court reviews only the evidence most favorable to the verdict and the reasonable inferences therefrom, and will reverse only where it is shown that "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Teising* [*v. State*], 226 N.E.3d [780,] 783 [(Ind. 2024)].

*Konkle v. State*, 253 N.E.3d 1068, 1090–91 (Ind. 2025). We do not reweigh the evidence or reassess witness credibility. *Id.* at 1090 (quoting *Teising*, 226 N.E.3d at 783).

[29] In order to prove that Luke committed invasion of privacy regarding the 2019 No Contact Order, the State had to prove that Luke "knowingly or intentionally" violated that order. I.C. § 35-46-1-15.1(a). Luke argues that after the trial court read aloud the order during the sentencing hearing in the 2018 Case and asked if Luke understood it, Luke responded, "Understand what?," Appellant's Am. Br. at 27, which indicates that Luke "did not hear and understand the trial court," *id*. at 28. Luke also argues that the letter

---

we affirm that conviction. *See* App. R. 46(A)(8)(a); *Miller*, 212 N.E.3d at 657 (Ind. 2023). Luke also does not challenge the sufficiency of the evidence regarding his stalking convictions, which we also affirm.

purportedly sent by T.C. to him on January 1, 2020, "led him to believe there had been a no-contact order but that it had been dropped or cleared." *Id.*

[30] Luke relies on *Tharp v. State*, 942 N.E.2d 814, 816–18 (Ind. 2011), to support his position that he lacked notice of the 2019 No Contact Order. In *Tharp*, the Indiana Supreme Court held that insufficient evidence supported Tharp's conviction for invasion of privacy because he was never served with the no contact order and only learned of the existence of the order through the protected person, who told him that the order was no longer valid at the same time as telling him about its existence.

[31] Here, unlike *Tharp*, the probative evidence and reasonable inferences supporting the verdict show that Luke did know of the 2019 No Contact Order. Luke's defense counsel from the 2018 Case testified that Luke was aware of the no contact order but refused to sign it; that was why the trial court read aloud the order to Luke during the sentencing hearing. The transcript of the hearing indicates that the trial court asked Luke's counsel, "Your client indicated that he was refusing to sign any [] protective order, is that still the case"; Luke's counsel responded in the affirmative; Luke did not say anything to the contrary; and the trial court proceeded to read the order aloud to Luke. Ex. Vol. VI at 147.

[32] Moreover, after Luke told the trial court, "Understand what?," the trial court responded, "That's about the response I expected from you. So, you've been told, you've heard it, and I'll acknowledge it for the record once again, you['re]

failing to cooperate." Ex. Vol. VI at 149. Luke's defense counsel testified that Luke did understand the no contact order and "just want[ed] to argue with the Court." Tr. Vol. VII at 163. We note that the same judge that presided over the sentencing hearing in the 2018 Case presided over Luke's trial here. The trial court could have reasonably concluded that Luke did understand the no contact order and was simply being obstinate.

[33] We also note Luke's trial testimony that, before his sentencing hearing in the 2018 Case, Luke "told" his defense counsel Luke would "just go ahead and sign [the 2019 No Contact Order] today to get it over with," Tr. Vol. VIII at 125, and that his defense counsel was "mistaken" by saying Luke refused to sign it, *id.* at 126. Whether or not this is true, it shows by Luke's own testimony that he knew of the 2019 No Contact Order.

[34] As for the letter purportedly written by T.C., which stated that the 2019 No Contact Order had been terminated, T.C. testified that she never sent Luke any letters. One of the lead investigators, Detective Garland Bridges, testified that Luke "wrote that letter and not [T.C.]" Tr. Vol. V at 35. Detective Bridges's opinion was based on similarities between that letter and the letters Luke admitted to writing, including the use of "sexual" language, *id.* at 35; the use of "hearts to dot i's"; *id.* at 37; references to Luke as the "Duke of Dillsboro," *id.* at 23; handwritten pagination in the top right of the pages; and the fact there was no envelope for the letter. The trial court was permitted to credit this testimony and find that Luke wrote the letter purportedly from T.C. And Luke's reference to the 2019 No Contact order in that letter indicates his

knowledge thereof. Sufficient evidence supports a finding that Luke knew of the 2019 No Contact Order, and thus sufficient evidence supports Luke's convictions for invasion of privacy regarding that order.

## 4. Luke's Sentence Is Not Unconstitutionally Disproportionate

[35] Luke's final argument is that his 61.5-year sentence is unconstitutionally disproportionate given his offenses. Article 1, Section 16 of the Indiana Constitution provides that "[a]ll penalties shall be proportioned to the nature of the offense." "Though we 'cannot set aside a legislatively sanctioned penalty merely because it seems too severe,' Article 1, Section 16 requires us to review whether a sentence is not only within statutory parameters, but also constitutional as applied to the particular defendant." *Knapp v. State*, 9 N.E.3d 1274, 1290 (Ind. 2014) (quoting *Conner v. State*, 626 N.E.2d 803, 806 (Ind. 1993)). "Article 1, Section 16 is violated 'only when the criminal penalty is not graduated and proportioned to the nature of the offense.'" *Hancz-Barron v. State*, 235 N.E.3d 1237, 1250 (Ind. 2024) (quoting *Knapp*, 9 N.E.3d at 1290).

[36] Luke argues that his sentence is disproportionate because he "was ordered to serve the equivalent of an aggravated murder sentence for sending annoying or alarming letters and cards," which is "shocking and unreasonable." Appellant's Am. Br. at 30. The length of Luke's sentence is largely due to the sheer volume

of letters and cards that he sent, most of which constituted an individual offense.[10] Those offenses add up.

[37] But the content of the letters and cards also matters. Luke discussed in detail the vulgar sexual acts he planned to commit on T.C.; hinted that he was watching her from prison and knew where she lived; and reminded her that he would "be out soon and [could not] wait to see [her] again," Ex. Vol. III at 223.

[38] Luke also painted horrendous scenes of the carnage he sought to reap on T.C., her family, and the town of Dillsboro once he was released. In the letters, Luke wrote that T.C.'s mother would be "severely punished," Ex. Vol. IV at 191, that Luke would "break every bone" in T.C.'s husband's body, *id.*, and that T.C.'s father would be hospitalized after Luke's "fists . . . r[an] into his head repeatedly." Ex. Vol. III at 240. Luke also claimed he would "probably have to go to the Louisville Slugger factory in Louisville and order a whole truck load of bats because [he] will be breaking alot [sic] of them on the skulls of the infidels soon." Ex. Vol. IV at 28. And he claimed that, at trial, he would "unleash hell" upon T.C. and her "tears will be the chum and blood in the water" while Luke would be "the starving, frenzied school of great white sharks." Tr. Vol. VI at 129.

---

[10] The trial court ordered Luke to serve his sentences consecutively, and Luke does not argue that this was improper. *See* I.C. § 35-50-1-2 (governing the imposition of consecutive sentences).

Luke's years-long barrage of letters and cards was a deliberate, meticulous attempt to terrorize T.C. And not only did he intend to commit each offense, but he also carefully planned a defense to them by writing himself a letter which purportedly was from T.C. Though no doubt long, Luke's sentence is not unconstitutionally disproportionate.

## Conclusion

In sum, the trial court did not err by denying Luke's motion to dismiss the stalking charges, the trial court did not err by denying Luke's motion to sever the charges, the State presented sufficient evidence to support Luke's convictions for invasion of privacy regarding the 2019 No Contact Order, and Luke's sentence is not unconstitutionally disproportionate. We thus affirm the trial court on all issues raised.

Affirmed.


Brown, J., and Scheele, J., concur.


ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana