Gamba M. **RASTAFARI,** (a/k/a **Gregory Rouster), Petitioner,**

v.

Ron **ANDERSON, Respondent.**

No. 3:99CV608 AS.

United States District Court, N.D. Indiana, South Bend Division.

Oct. 24, 2000.

Alan Freedman, Carol R. Heise, Chicago, IL, for Plaintiff.

Arthur T. Perry, Michael A. Hurst, Indianapolis, IN, for Respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

Petitioner, Gamba Rastafari, was convicted of murder in a state court trial conducted in Lake County, Indiana, and was sentenced to death by the judge conducting that trial upon the recommendation of the jury that heard the case. The

within petition was filed by counsel in this Court on February 4, 2000 and oral argument was heard in Lafayette, Indiana on August 11, 2000. This Court greatly appreciates the high degree of professional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA) 28 U.S.C. § 2244(b). Immediate reference is made to the two decisions in this case by the Supreme Court of Indiana, namely *Rouster v. State*, 600 N.E.2d 1342 (Ind. 1992), and *Rouster v. State*, 705 N.E.2d 999 (Ind.1999). This petitioner is now confined on death row at the Indiana State Prison in Michigan City, Indiana in this district.

## I. Factual and Procedural Background

The evidence presented at trial developed the following facts regarding the murders of John and Henrietta Rease. As neither Gregory Rouster nor Darnell Williams, his co-defendant, have testified or otherwise made statements on the record regarding the facts of the case, the facts elicited at trial are the best description of the events of August 12, 1986.

On August 12, 1986, Jack Baumer, a child welfare caseworker employed by the Lake County Department of Public Welfare, ran into one of his former charges, Gregory Rouster, at a drug store in Gary. T.R. 812.[1] Baumer had worked on Rouster's case while he placed at the Gibault School for Boys in Terre Haute, and had later placed Rouster in the home of John and Henrietta Rease, 2430 Jennings Street in Gary, for his last few months in the care of the state, from November 1985 through his eighteenth birthday on February 7, 1986.[2] T.R. 811. During their encounter on August 12, 1986, Rouster asked Baumer if the Reases had received a clothing allowance for him from the state during their brief foster care relationship. T.R. 818. When Baumer responded that the Reases had received a small amount of clothing allowance, approximately five to six dollars per month, Rouster told him that he had not received any clothing and that he was going to get the money from the Reases. T.R. 819–20.

Eugene Powell, a young man who lived across the street from the Reases, was outside with his friends at approximately 8:30 or 9:00 p.m. on the evening of August 12, 1986. T.R. 858–59. Powell saw Rouster, Rouster's girlfriend, Tina, a friend of Rouster's, and another girl coming down the street towards the Powell and Rease homes. Powell knew Rouster from his time as a foster child in the Rease home. T.R. 860–62. Rouster stopped at the Hicks home and inquired if a Tony was home. When told he was not, the four continued on to the Rease home. T.R. 866–68. Powell watched Rouster and Tina go into the Rease home while the other two stayed outside. T.R. 868–69. Powell and his friends walked to the corner of Jennings and 25th Avenue, then turned around and walked back, and as they were walking, they heard what sounded like two firecrackers. T.R. 869–71. Powell then saw Rouster's friend using a cigarette lighter to look for something on the ground. T.R. 871–72. Powell and his friends saw Rouster come out of the house and go to the garage. T.R. 878–79. Powell and a friend, Demond, walked up the Reases' driveway, but when they heard Rouster say, "who's up in here, we shoot," they turned around and went back across

---

1. This court will refer to the record from the trial as T.R. ___, and to the record from the post-conviction proceedings as P.C.R. ___.

2. This court will refer to the victims by the correct spelling of their name, Rease. The trial transcript consistently misspells their name as Reese, and the court will use that spelling when quoting the record, but will otherwise use the correct spelling.

the street. T.R. 880. Powell and his friends again walked down the street, and Powell heard three more firecrackers, at which time they returned to Powell's house. TR. 881–82. Powell noticed that all the lights were off in the Reases' house except for the television, and Powell saw a shadow pointing inside the house. T.R. 883. Powell and his friends again walked down the street, where they heard two more firecracker sounds, and they went into a friend's house. T.R. 884. Powell eventually returned home to see if his father had arrived home; as he did, he saw Rouster standing in the Reases' driveway talking to Tina. T.R. 886–87. Powell saw his father and started running for his father's car, but as he ran, he heard Rouster state to Tina "I killed the motherfuckers." T.R. 891–92. Powell then saw a police car pull up to where Rouster and Tina were talking, and he saw Rouster pointing down the street. The police then pulled away and stopped at a different house down the block. T.R. 893. As Powell and his father drove away, they heard another firecracker sound while Rouster and Tina were still in the driveway. T.R. 893–94.

Jamal Pope was with Powell on August 12, 1986, and he also recognized Rouster and Tina that evening. When Pope and Powell were walking back from 25th Avenue the first time, Pope also noticed the person looking for something with a cigarette lighter, and he saw that person admitted into the Rease home. T.R. 1829–31. Pope then heard some shots while sitting on Powell's ledge. T.R. 1831. He saw Rouster leave the house and walk towards the back of the house, then reenter the house, after which he heard more shots. *Id.* Pope then went with Powell to call Powell's father, during which time he heard more shots. T.R. 1832. Finally, he ran to Powell's father's car, at which time he saw Rouster talking to Tina, asking her "do you still love me?" *Id.* Pope saw Rouster and Tina redirect the police car and he heard one more shot from inside the Rease home, and then he left the scene. T.R. 1832–33. Pope identi-

fied Rouster and Tina at trial as the people he had seen, and further identified Darnell Williams as Rouster's friend who was looking for something with the lighter. T.R. 1837–39.

Clyde Cunningham went to the Rease home shortly before 9:00 p.m. on the evening on August 12, 1986 to purchase a pack of cigarettes from their small store. T.R. 1177. As Cunningham approached the store entrance, a young woman approached him and told him the store was closed. T.R. 1184. Cunningham did not try to go into the store, although he noticed that the wire gate was still open and the lights were still on in the house. T.R. 1185. Approximately five to ten minutes later, Cunningham heard what sounded like gunfire coming from the direction of the Rease home. T.R. 1187.

Demond Ligon, another young resident of the neighborhood, was with his friends, Eugene Powell, Jamal Pope, and Jimmy Gray, on the evening of August 12, 1986. T.R. 1785. Ligon testified that he walked to 25th Avenue with his friends, where he heard two "pops." T.R. 1788. When the group walked back toward the Rease home, Ligon saw Edwin Taylor, another foster child of the Reases, under a car in the driveway next to the Reases' house, and he saw Rouster's friend looking for something in the Reases' yard with a lighter. T.R. 1787. Ligon and Powell began walking toward the Reases' driveway, at which time Ligon saw Rouster standing by the garage and heard him say "come out or I'll shoot." T.R. 1790. Ligon and Powell then returned across the street, where he saw Rouster's friend bang on the front door of the Reases' home and be admitted. T.R. 1794. Shortly after that, Ligon heard more "pops" coming from the house, and the group ran to Ligon's home to use the phone. T.R. 1795–96. Ligon identified Rouster in court, but not the others. T.R. 1798.

Jimmy Gray was another of the group of young people outside on the night of Au-

gust 12, 1986 who saw Rouster approach the Rease home with another man and two women. T.R. 1515–17. Gray walked with his friends to 25th Avenue, and as they returned, he heard what sounded like two shots. T.R. 1521. Gray then saw a boy on the ground in front of the Reases' home, looking for something with a lighter and saying something about his shells. T.R. 1523–24. Gray went inside his home, where he heard more shots. T.R. 1525. Gray identified Rouster as one of the people present that evening. T.R. 1527. Gray also testified that he saw Rouster drinking from a bottle of Private Stock. T.R. 1534.

Lelia Gray, Jimmy's mother, was at home on the evening of August 12, 1986. T.R. 1540. Mrs. Gray heard a lot of noise and cursing outside her home that evening. *Id.* She saw two boys wrestling in the Reases' driveway, with one boy yelling that he wanted his share. T.R. 1541–42. She heard a young lady dressed in white ask for bus fare and one of the boys told her to leave. T.R. 1543–44. Mrs. Gray saw the two boys at the Reases' front door, trying to push their way in, and she noticed that one boy had a gun in his back pocket. T.R. 1545. She saw the two boys enter the home and then heard what sounded like gunshots. T.R. 1546. She later saw one boy and the girl in the driveway, where she heard the girl ask the boy why he did what he did, and heard the boy say that he killed the motherfuckers and that the girl should go home, although the girl protested that she did not have bus fare. T.R. 1557–58. Mrs. Gray saw a police car pull up to the Reases' home and saw the boy and girl tell the police that the disturbance was down the block; she then watched the boy and girl walk to the back of the Reases' home and she heard one more shot. T.R. 1559–61.

Gloria Williams, the Reases' next-door neighbor, was at home on the evening of August 12, 1986 as well. T.R. 1230. After receiving a telephone call at approximately 9:15 p.m., Williams heard a commotion go-

ing on at the Reases' home, followed by a loud bang and a scream. T.R. 1231. She then heard another bang, things being thrown around in the bedroom, and a voice saying "get it, you know where it is, go get it." T.R. 1231. She then heard more shots and called the police. T.R. 1235, 1239. She noticed a man and a woman in front of the Rease home arguing, with the boy saying "you don't love me" and the girl saying "yes, I do. You know I love you." T.R. 1239–41. Williams then heard another voice tell the boy to take her home. T.R. 1241–42. Williams testified that the voice of the boy who was arguing was the same as the voice she heard in the Reases' bedroom. T.R. 1243.

Officer Rita Dorsey, of the Gary Police Department, was the officer sent astray by Rouster on August 12, 1986. T.R. 962–64. Dorsey responded to a radio call of shots fired and found a black male and a black female standing at the door of the home "casually chatting." T.R. 964. The girl approached the car and told her that it might have been a different house down the street, as there was no disturbance at that location. T.R. 968. Dorsey and her partner went to the other house and talked with a woman there. After the conversation, Dorsey heard a shot which she thought came from the next block, so she returned to the patrol car and she and her partner circled the block. T.R. 969–70. As they circled the block, they were flagged down by a young man named Derrick hiding in a weeded area, who took them back to the Reases' home. T.R. 971–72. Dorsey entered the home with her fellow officers, searched the home, and found the bodies of a black male and black female on the floor of a bedroom in complete disarray. T.R. 975.

Gary bus driver Donna Thomas was working the evening shift on August 12, 1986. She picked up two girls and two boys at 21st and Broadway shortly after starting her route at 8:05 p.m. T.R. 1133. She identified Gregory Rouster as having worn a white shirt, black Kangel hat and

flowered Hawaiian pants and Darnell Williams as having worn all dark clothes. The four were somewhat rowdy and she noticed that they all four got off at 21st and Hendricks, approximately six to eight minutes after boarding. T.R. 1134–36, 1160. After her lunch break, around 9:20 p.m., the young man she identified as Rouster and the young woman she identified as Tina, or Theresa Newsome, ran across the street at 21st and Chase and boarded the bus. T.R. 1162. As Thomas crossed the intersection of 25th and Chase, she noticed an Indiana State Police car, and she saw Rouster and Newsome crouch down in their seats. T.R. 1164. The two then got off the bus at 21st and Broadway. T.R. 1165.

Rodney Means, an Indiana State Police Trooper, heard the Gary police report and met with the officers at the Rease residence. He then continued his regular patrol. T.R. 992–94. As he approached 21st and Broadway, he saw a boy and a girl running toward a bus there, and he saw that they matched the description of two of the suspects. T.R. 994–95. Thus, he followed the bus south to 41st and Broadway, where the pair exited the bus, at which time he parked his car and approached the pair. T.R. 995–96. The girl said they had boarded at 11th and Broadway, and the boy told Trooper Means that they were coming from the east side of Gary, but then stated they came from Porter Street, which is on the far west side of Gary. Means continued to question the pair, telling them he had seen them board the bus at 21st and Broadway. TR. 1009–1010. Means asked the boy what was bulging in his shirt pocket, and the boy answered bullets or ammunition. When the boy handed the ammunition to him, Means saw what appeared to be 20 or more bullets. T.R. 1010–1012. Means walked to the rear of the boy and noticed red spots on his white shirt. T.R. 1081–82. Means transported the boy back to the Reases' home, and then to the Gary City Jail. T.R. 1083–84. Means identified Rouster as the individual he transported that night, and fur-

ther identified Theresa Newsome as the girl with Rouster. T.R. 1085–87. Another Indiana State Police Trooper, Al Brown, had joined Means at 41st and Broadway, and Brown read Rouster and Newsome their Miranda rights and then transported Newsome back to the Reases' home. T.R. 1199–1201.

Lake County crime technician Ronald Lach attended the crime scene, then went to the Gary City Jail to observe Rouster, where he noticed red drops on the back of Rouster's white vest. T.R. 1248–49, 1350–52. Lach submitted Rouster's clothing to the Indiana State Laboratory for testing, which later determined the spots on his vest to be consistent with the blood of John Rease, and spots on Rouster's t-shirt to be consistent with the blood of John Rease, Henrietta Rease, or Rouster himself. T.R.1947–66.

Michael Reilly, an evidence technician with the Lake County Police Department, collected several items laying in the driveway of the Rease home on the night of August 12, 1986. T.R. 1624, 1626. He was able to lift fingerprints from several items, including various packs of cigarettes lying in the driveway. T.R. 1630–31. Robert Piskoty, a fingerprint examiner for the Lake County Police Department later established that prints on five of the packs were those of Rouster. T.R. 1707–79.

Ronald Lach, the Lake County crime technician, also searched the Rease home for evidence on the night of August 12, 1986. T.R. 1268–70. As Lach approached the southeast bedroom, he noticed a live .32 caliber cartridge case and a quarter were lying on the floor and that the door was slightly ajar. As he pushed the door open, he saw the first victim laying with his knees bent around the door and the second victim laying wedged between the bed and dresser with her head resting on the open drawer of a nightstand. T.R. 1276–77. Lach found the bedroom to be completely ransacked and saw that the victims were covered by clothes from the

drawers. He also found live .30 caliber ammunition in the doorway going into the bedroom. T.R. 1291–93. He also found two fired .32 caliber cartridge cases and two or three live rounds of .22 caliber bullets lying on the floor. T.R. 1293–94. He found two boxes of ammunition on the bed's headboard: Remington .32 caliber Smith & Wesson live rounds and Western X .25 caliber automatic live rounds of ammunition. He found two other boxes of ammunition on a nightstand: Winchester Super Western .38 caliber live rounds and Remington .32 caliber Smith & Wesson live rounds. T.R. 1294–95.

Lach found a wad of money behind the corner of the dresser and coins lying on the floor. T.R. 1309–10. He found a hole in the wall which went through the wall and into the aluminum siding. T.R. 1311–12. He also found a gouge out of the wood on the nightstand and a hole in the side of the refrigerator which was found to be caused by a lead projectile. TR. 1313–15, 1325. Lach found two guns in the home, a .22 caliber weapon and a pellet or B.B. pistol. T.R. 1330–31. In the driveway he found a white plastic bag with money, cigarettes and loose change in it, as well as a tool box and other cigarettes on the ground. T.R. 1344–45.

Lach returned to the Rease home on August 19, 1986, at which time he found two more loose rounds of .22 caliber live ammunition and three fired .32 caliber cartridge cases in the bedroom. T.R. 1352–53. He then searched in the weeds behind the Rease home and found a .32 caliber revolver lying on the grass. T.R. 1353–55. Lach found one fired .32 caliber cartridge case inside the cylinder.

Jay Gauthier, a firearms examiner for the Lake County Crime Lab, determined that the five .32 calibers fired casings found in the bedroom were fired by the .32 caliber revolver found in the weeds behind the Rease home, as were two bullets recovered from the victims (one from each victim). T.R. 1373–77, 1687–89. The victims were both found to have been killed by bullet wounds: John Rease received one shot, which lacerated his lung, and three shots to Henrietta Rease, a non-lethal shot in her abdomen, and one shot on each side of her temple, each of which lacerated her brain. T.R. 2138–42.

The final piece of the puzzle at trial was the testimony of Derrick Bryant, another foster child of the Reases. Bryant was living at the Rease home on the night of August 12, 1986 with Edwin Taylor, another foster child, and the Reases. T.R.2018–19. Bryant saw Rouster, Williams, Newsome and Kim (Toney, Williams' girlfriend) walking towards the Rease home around 9:00 p.m. Bryant knew the four from when Rouster lived with the Reases. T.R.2019–20. The four entered the home and Rouster and Mrs. Rease went to Rouster's former bedroom to talk. T.R.2021. Bryant heard Rouster say that Jack had told him he was supposed to get some money, to which Mrs. Rease responded that she didn't know anything about it. The two returned to the living room and everyone began arguing. Mrs. Rease then had everyone leave the home, although the group continued hollering outside. T.R.2023–26. Bryant heard Dee (Darnell Williams) say "I won't let her, she's doing nothing but gyping you out of the money," then heard a shot and someone running through the backyard. T.R.2026–27. Bryant heard Edwin Taylor say "you all have guns, you all go take the money," to which Rouster responded "where is the money at?" and Taylor answered, "it's on the dresser." T.R.2029–30.

Bryant started to the front room to tell the Reases what he had heard, but he saw Rouster coming through the front door and went to hide. T.R.2037. He then heard Rouster tell Mrs. Rease "I know how to act now and I don't need us to go through this because I got a gun and you got a gun." T.R.2037. Rouster then asked where the money was, and Bryant hid under the stairs by the back door. T.R.2037–39. Bryant heard Rouster say "bring both of them back here." He heard

someone fall into the wall. Williams said "it's your time." Mrs. Rease said "Greg, why are you doing this?" and Rouster responded "my name ain't Greg." T.R. 2039–41. Bryant then heard a shot, followed by someone entering the kitchen, closing the side door, and then money falling to the floor. T.R.2042. Bryant heard more shots coming from inside the house, at which time he ran out the door to his friend Sam's house. T.R.2044–25. Bryant identified Rouster, Williams and Newsome as three of the four who had come to the house that night. T.R.2051–52.

Rouster was arrested on the night of August 12, 1986 after having been detained by Trooper Means. Attorney Robert Lewis was appointed to represent Rouster on August 15, 1986, and additional counsel Noah Holcomb was appointed on January 7, 1987. On October 6, 1986, Lewis filed a motion for insufficient comprehension, alleging that Rouster was not fit to stand trial, but after examinations by Dr. Myron Berkson and Dr. George Batacan, the court found Rouster fit on October 28, 1986. Although counsel for Darnell Williams filed a general motion for severance on February 3, 1986, which motion was denied, counsel for Rouster did not file a motion for severance.

The jury was selected in one day on February 9, 1987, and the trial began on February 10, 1987, at which time Rouster's counsel waived opening argument. P.C.R. 77. Closing arguments were made on February 16, 1987 by attorney Lewis. T.R. 2558. Prior to the start of closing arguments, Judge James Letsinger told the parties that if Rouster turned on Williams during his close, since Rouster was going last, the judge would place his glasses on the bench, signaling that Rouster had an additional fifteen minutes of argument, and then the counsel for Williams and Newsome would each get fifteen minutes of rebuttal closing argument after Rouster. T.R. 2462. Lewis argued almost immediately that the other defendants were celebrating "dump on Gregory Rouster week." T.R. 2559. He pointed out that no one had testified who was actually in the room, and that the only blood found on Rouster was on his back, suggesting he was not facing the Reases when they were shot. T.R. 2564. He also emphasized that Rouster was seen outside when the last shot was fired and that Rouster was intoxicated during the offense. T.R. 2568, 2573. Finally, he suggested that Darnell Williams was, as the oldest of the group, the ringleader and the driving force behind the murders. T.R. 2586. The jury returned a verdict of guilty on both counts as to Rouster and Williams on February 17, 1986. P.C.R. 79.

Rouster's counsel again waived opening argument during the penalty phase. T.R. 2711. During the penalty phase, the state presented the testimony of Edwin Taylor, who had been a co-defendant with Rouster and Williams, but who had pled guilty to robbery on the first day of voir dire. P.C.R. 55. Taylor testified that Williams had demanded that the Reases give Rouster his money and that Rouster produced a gun and fired several shots. T.R. 2730–33. Williams then took the gun from Rouster and demanded that Taylor tell them where the money was. T.R. 2736. Taylor testified that both appeared to be drunk at the time, and he claimed that Rouster had threatened to rob the Reases two or three weeks before the incident. T.R. 2743, 2753. The state also presented evidence that Rouster had been adjudicated a delinquent in 1982 on two counts of burglary. T.R. 2783. Rouster's evidence during the penalty phase consisted of the testimony of three of his welfare caseworkers and his welfare file, which revealed that he had been abandoned at birth by his fourteen year old prostitute mother. T.R. Defendant's Exhibit 11. Rouster lived in a number of foster homes and institutional placements prior to his final placement with the Reases in November, 1985. He was tested on several occasions and found to have mild mental retardation. T.R. 2917–19.

During closing arguments, both attorneys addressed the jury; attorney Holcomb addressing Rouster's unfortunate childhood [3] and attorney Lewis suggesting that Rouster had not intentionally murdered the Reases as he was not the triggerman. As with the closing arguments during the guilt phase, the judge gave each side extra time, and allowed Williams a rebuttal, because they argued against each other. The jury returned a recommendation of death for both Rouster and Williams on February 19, 1987.

At the sentencing hearing on March 20, 1987, Rouster did not present any witnesses nor did he testify. T.R. 3180. The judge sentenced Rouster to death, stating that he found no mitigating circumstances, that he found all three alleged aggravating circumstances, i.e., that Rouster had killed each of the Reases intentionally and that he had murdered two or more people. The court then stated as follows:

> The elderly members of this society should not have to live in fear of predation. The predators should live in fear that upon their inevitable capture, their inevitable trial, their inevitable conviction will result in the inevitable capital penalty. Only then is fear properly placed.
>
> In this case with this defendant the facts more than meet the statutory requirements and the penalty is appropriate to apply.
>
> The defendant, Gregory Anthony Rouster, is now sentenced to death.

T.R. 148.

Rouster appealed his conviction and sentence directly to the Indiana Supreme Court, raising on appeal the failure to sever Rouster's trial from Williams, the unusual rebuttal argument allowed to Williams during both the guilt and penalty phases, the alleged unconstitutionality of IND.CODE § 35–50–2–9 in its failure to define recommendation and the failure of the court to instruct the jury on the importance of its recommendation, and finally on the appropriateness of the sentence in this case. Rouster was represented on appeal by attorney Scott King, the appellate public defender for Lake County.

Chief Justice Shepard, writing for the majority, addressed those issues in his opinion of October 16, 1992. On the issue of severance, the court found that because Williams' motion only stated that "his interests, rights and his defense hereto [would] be prejudiced if he [were] tried with the remainder of the defendants herein," the motion was properly denied. *Rouster v. State,* 600 N.E.2d 1342, 1346 (Ind.1992) (quoting T.R. 50). Additionally, because Rouster failed to file a separate motion to sever or make a subsequent motion at the close of evidence as required by statute, he waived the issue on appeal. *Id.* Rouster appealed the unusual closing argument procedure used during the guilt and penalty phases, but the court found that "control of final argument is assigned to the discretion of the trial judge," and found that no abuse of that discretion had occurred. *Id.* at 1347. Additionally, the court found that Rouster waived his assertion of error during the penalty phase because he failed to object. *Id.* Rouster then argued that the statute was unconstitutional because it failed to define 'recommendation,' citing *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d

---

**3.** Holcomb was not entirely clear in his argument on Rouster's behalf, though.

"Where was the time for the nurturing to happen, the parental guidance, the male authority figure, the rules that you all live by, that I live by, when was all that put into him, when was all that put into him. You're talking about somebody, Gregory, as a good—this may sound brutal, he is a good argument for enforcement [sic] steriliza-tion, a good argument for abortion. What has happened to him? What his life has been like, what he has done, the Reeses might still be alive if he hadn't been around, for whatever reason. If his mother had been sterilized when she went to Girls' School because she couldn't keep her dress down and her panties up, he wouldn't be here and perhaps the Reeses would be alive." T.R. 3080.

231 (1985). *Id.* The court had previously rejected that argument in *Canaan v. State,* 541 N.E.2d 894 (Ind.1989), *cert. denied,* 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 185 (1990), and rejected it here as well. *Id.*

Finally, Rouster argued that the evidence and the findings of the court were inadequate to support the sentence. *Id.* at 1349. Rouster conceded that the aggravating circumstances were proven beyond a reasonable doubt, but argued that the mitigating circumstances were not outweighed by the aggravating circumstances, and thus the death penalty should not have been imposed. *Id.* at 1350. The court held that the jury and the trial judge had been aware of this evidence prior to reaching their decisions regarding the death sentence, and further found on its own review that the aggravating circumstances predominated. *Id.* Thus, it denied this claim. Justice DeBruler concurred on the conviction, but dissented as to the penalty, finding that the Reases had been armed and had been warned by the shots fired by Rouster outside the house, and that Rouster intended to get even with the Reases regarding the clothing allowance. *Id.* at 1351–52. Justice DeBruler gave Rouster's childhood credit as a mitigating circumstance and found the aggravating and mitigating circumstances to be evenly balanced, thus requiring the court to set aside the death penalty. *Id.* at 1353.

Rouster then filed his initial petition for post-conviction relief on August 27, 1993, represented by attorneys Alan Freedman and Carol Heise of Chicago, and James Thiros as local counsel. P.C.R. 88, 155. Rouster raised the following claims in his initial petition: that he was denied effective assistance of counsel due to the indigent defense system in Lake County, that he was denied effective assistance of counsel due to the prejudicial acts and omissions of his court-appointed trial counsel and the prejudicial acts and omissions of the trial court, that he was denied effective assistance of counsel due to the prejudicial acts and omissions of his court-appointed appellate counsel, that he was denied his right to a fair review of his sentence by the Indiana Supreme Court, that the death penalty is applied in a needlessly painful and inhumane manner in violation of the Eighth Amendment, and that his rights of due process and effective assistance of counsel under the Fifth and Sixth Amendments were violated when he was convicted and sentenced based upon insufficient evidence of intent to murder. P.C.R. 156–57. Rouster's counsel moved for a change of judge, which motion was granted, and the petition for post-conviction relief was transferred to Judge Richard Conroy of the Lake County Superior Court, Criminal Division, although Magistrate T. Edward Page conducted all hearings in the cause. P.C.R. 184. On November 15, 1984, Chief Justice Shepard directed Judge Conroy to render final judgment on the postconviction petitions of Rouster and five other capital cases, including Darnell Williams, by February 28, 1996. P.C.R. 284–85. Rouster filed his amended petition on April 28, 1995, alleging ineffective assistance of trial and appellate counsel, fundamental errors in the jury instructions, false evidence submitted to the jury, the constitutionally invalid sentencing scheme in Indiana, and the cruel and unusual mode of execution by electrocution. P.C.R. 334.

A hearing was held by the court during the week of June 26, 1995, and several depositions and exhibits were presented as a part of that hearing. P.C.R. 1523–2022. During that hearing, the court received an affidavit from Dr. Jeffrey Gwynne, a reconstruction expert, who reported that it was highly likely that Rouster was acting in self-defense at the time Henrietta Rease was shot, based on the angle of the bullet path and the location of the hole in her dress. P.C.R. 2631. Additionally, Dr. Gwynne opined that the fatal wound to John Rease might support a theory that Rouster was acting in self-defense when Rease was shot. P.C.R. 2632.

Gloria Williams, the Reases' next door neighbor, testified that the Reases had used inappropriate and deadly force in dealing with their foster children and that, on several occasions, the Reases cheated her five year old daughter out of her change from the candy store. P.C.R. 2118–19, 2155–56. Jimmy Gray, who lived across the street from the Reases, testified that he saw the Reases carry guns in their home and saw a rifle in their bedroom. P.C.R. 2252–54.

Rouster presented evidence that the scene had been tampered with, that the prosecution had known of the tampering and had failed to share that information, and that Rouster's trial counsel had been ineffective for failing to discover the information. Officer Michael Gault testified at the PCR hearing that he had entered the Rease home first with Officer Rita Dorsey. P.C.R. 1584. When he entered the Reases' bedroom, he saw Henrietta Rease in an elevated position, looking like she "was thrown across a horse." P.C.R. 1588. The offense report prepared by Officer Busse Smith at the time of the offense stated that Henrietta Rease was lying face down on the bed. P.C.R. 444. Officer Rita Dorsey and Lake County investigator Ron Lach both testified that Mrs. Rease was lying on the floor between the bed and dresser, with her head lying in the open drawer of the nightstand. T.R. 1276–77. Rouster further presented the evidence of Mark Germani, Ph.D., who testified that the State could have performed gun residue tests on the hands of the victims to determine if they had fired or handled the gun during the evening of August 12, 1986. P.C.R. 1670, 1674.

Rouster also presented additional mitigation evidence which his trial counsel could have presented during the penalty phase had they made a full investigation. Included in that evidence were the medical records of Barbara Rouster, Rouster's mother, which indicated she was a heroin user during her pregnancy with the petitioner and that she had unsuccessfully attempted to abort the petitioner during the first few months of her pregnancy. P.C.R. 591–92, 600–01. Rouster was born with severe breathing complications and an APGAR score of 4 at one minute. P.C.R. 616, 618. He was placed in a unsupervised, unlicensed foster home for his first four years, and when the State agency "found" him, he had a significant speech impediment and trouble with memory. P.C.R. 626–28. Dan Williams, Ph.D., a psychologist who examined Rouster, determined that he suffered from frontal lobe damage which impaired his ability to control certain behaviors, and that this damage was present at the time of the offense. P.C.R. 634–651. Michael Gelbort, Ph.D. a neuropsychologist, testified that after examining Rouster, he had diagnosed Rouster as suffering from attention deficit disorder, a form of brain disorder, which had been present at the time of the crime. P.C.R. 1731–50. Dr. Sidney Hans, a researcher at the University of Chicago, had conducted a long-term study on children whose mothers used heroin during pregnancy, and she opined that there was a strong likelihood that Rouster's neuropsychological deficits and attention deficits were due to prenatal exposure to heroin. P.C.R. 663–65. Gladys Brown, M.A., an educational psychologist, also found after personally testing him that Rouster had learning disabilities. P.C.R. 748.

Rouster presented the testimony of his trial counsel by deposition during his PCR hearing. Robert Lewis testified that he had represented four or five capital defendants before Rouster. P.C.R. 2277–80. Lewis admitted that he had not used or attempted to obtain expert testimony, but agreed that he would have used the reconstruction expert's report had it been available to him. P.C.R. 2291–94. However, Lewis thought he would not have known to obtain the expert's report because Rouster was being uncooperative with him by failing to give him his version of the facts. P.C.R. 2283–84, 2293. Lewis did not disclose any strategic reason for failing to

attend the depositions of a majority of the state's witnesses; he simply felt that the co-defendant's counsel adequately represented Rouster's interests. P.C.R. 2324–25. Finally, Lewis stated that he had no strategic reason for failing to make a motion for severance either prior to trial or at the close of evidence; he stated " to be quite frank, it didn't even occur to me ... since the Motion for Severance [filed by counsel for Williams] had already been denied." P.C.R. 2320–22. In the sentencing phase, Lewis' strategy was to generate sympathy for Rouster by letting the jury know about his deprived background and mental difficulties. P.C.R. 2314–15. Lewis did not use an expert and had never used an expert to assist him in a capital case. P.C.R. 2307–09.

Noah Holcomb, Rouster's other counsel, testified that he had worked as a public defender since 1980 and had tried one death penalty case prior to Rouster's. P.C.R. 2400–01. Holcomb testified that the defense strategy was to show the existence of reasonable doubt; that he would have used the reconstruction expert, but that he had never attempted to obtain any expert in any case prior to Rouster's trial; and that he might have used the evidence about the Reases' care for their foster children as further evidence of self-defense. P.C.R. 2410–30. For the penalty phase, Holcomb again stated that he had never obtained an expert, but that he would have used the information obtained by PCR counsel had he had it available. P.C.R. 2414–16. His primary strategy in the penalty phase was to argue about the cruelty of electrocution and tell the jury about Rouster's background and intelligence. Holcomb stated the logic behind his comment to the jury regarding "a good argument for abortion" was that he wanted to show the jury "the only question was when something like this was going to happen ... If he would be the victim of some kind of violent crime or if he would be the perpetrator." P.C.R. 2441.

Scott King, Rouster's appellate counsel, testified that this was his first capital appeal. P.C.R. 1475. He did not investigate matters outside the record because he believed his duty was to prepare an appeal based on the record. P.C.R. 1479. He did not want to raise claims of ineffective assistance based on the record, and then bar Rouster from raising other claims in postconviction, which he felt was the appropriate venue for ineffective assistance claims. P.C. R. 1484.

Dr. Kathleen Pueschel, Ph.D., a neuropsychologist, testified for the state at the PCR hearing. She testified that based on the data provided by Drs. Gelbort and Williams, she did not find any evidence of attention deficit disorder or frontal lobe disorder in Rouster. P.C.R.1965.

Rouster also presented on post-conviction relief a study by the Spangenberg Group which attacked the efficacy of the Lake County Public Defender system and basically suggested that the public defenders, due to excessive workloads, restraints placed by the judges who appointed them, and other factors, provided per se ineffective assistance of counsel during the period 1982—1992.

On February 28, 1996, Magistrate Page, with the approval of Judge Conroy, entered his findings of fact and conclusions of law and dismissed the post-conviction petition in its entirety. P.C.R. 1189–1222. He found that the jury instructions did not contain fundamental error, as alleged in the petition. P.C.R. 1198–1200. He found that the prosecutor did not present evidence which he knew or should have known was false, regarding the position of Mrs. Rease's body. P.C.R. 1201–02. Finally, he found that Rouster was not denied effective assistance of counsel due to the public defender system in Lake County, nor due to the errors and omissions of his appellate counsel, nor due to the errors and omissions of his trial counsel. P.C.R. 1202–12.

Rouster appealed the denial of his petition for post-conviction relief directly to

the Indiana Supreme Court, where he raised the following issues: that the trial court used an incorrect standard of review in evaluating Rouster's claim of ineffective assistance of trial counsel;[4] that Rouster was denied effective assistance of counsel at trial during both the guilt and penalty phases of the trial, especially in the failure to file a motion for severance and the failure to present experts on self-defense and mitigation; that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness; that Rouster was denied a fair trial because the prosecution presented evidence regarding the scene of the crime which he knew or should have known was false; that fundamental errors existed in several jury instructions; that the trial judge secretly prepared a psychological profile of Rouster without notice to counsel; and that Rouster was denied due process by Magistrate Page during the PCR proceedings.

The Indiana Supreme Court, again writing through Chief Justice Shepard, affirmed the decision of the post-conviction court. *Rouster v. State*, 705 N.E.2d 999, 1017 (Ind.1999). The court first considered Rouster's claims of ineffective assistance of counsel under both state and federal constitutional grounds. *Id.* at 1003. Reviewing the motion for severance issue, the court found that under Indiana law, a defendant does not have an absolute right to severance, but the court will find an abuse of discretion if a party files a motion for severance which is denied, "and the parties' defenses are mutually antagonistic to such a degree that acceptance of one party's defense precludes the acquittal of the other." *Id.* at 1004, citing *Lampkins v. State*, 682 N.E.2d 1268, 1272 (Ind.1997). The court found that a jury could have

acquitted Williams based on his reasonable doubt argument, and Rouster could have been acquitted on his intoxication defense. *Id.* at 1005. Additionally, there was no reasonable probability that a different outcome would have occurred in the guilt phase had the trials been severed. *Id.* Thus, no error would have occurred if the trial court had denied a motion to sever by Rouster, and thus, Rouster's counsel was not ineffective for failing to file the motion. *Id.* The court also found Rouster's claim of ineffective assistance for failure to raise the potential self-defense claim to be lacking because self-defense is not a defense to robbery. *Id.* at 1006.

The court rejected Rouster's claims of ineffective assistance during the penalty phase as well, finding that the additional mitigating evidence presented by the experts on PCR was not significantly different than the information presented to the jury during the penalty phase. *Id.* at 1006–07. The court also found that Rouster's counsel was not ineffective for failing to file a motion to sever prior to the penalty phase, because Rouster had not offered any evidence different than that available at the beginning to trial to suggest that severance was necessary for the determination of guilt or innocence. *Id.* at 1007. Finally, the court found that the failure to raise various penalty instructions issues by trial counsel was not ineffective assistance. *Id.* at 1008.

The court further rejected Rouster's claim of systemic defects in the Lake County public defender system, as it had in *Coleman v. State*, 703 N.E.2d 1022 (Ind. 1998) and other cases. *Id.* at 1013. Rouster's claim of false evidence in the position of Mrs. Rease's body was also rejected, as

---

**4.** Magistrate Page reviewed Rouster's claim for ineffective assistance of trial counsel under the theory that it was only available if Rouster first proved his appellate counsel was ineffective for failing to raise the ineffectiveness of trial counsel in his direct appeal. After the petition was denied, but before the Indiana Supreme Court ruled on the appeal, the Indiana Supreme Court decided that peti-

tioners could raise ineffective assistance of trial counsel for the first time in their petitioner for post-conviction relief. Magistrate Page had taken evidence on ineffective assistance of trial counsel as an offer to prove, so the Indiana Supreme Court was able to consider the issue without requiring a remand. *Rouster v. State,* 705 N.E.2d 999, 1003 (Ind. 1999).

the court found the evidence did not lead "unerringly and unmistakably" to a decision opposite the findings of the PCR court. *Id.* at 1014. On the issue of the pre-sentence questionnaire, the court reviewed the sentence absent the psychological questionnaire to determine the appropriateness of the death sentence, and found, as it did in *Matheney v. State,* 688 N.E.2d 883, 908–10 (Ind.1997), that the evidence supported the sentence without reference to the questionnaire. *Id.* at 1015. Finally, the court denied Rouster's claims of violation of due process during the PCR proceeding, finding that the various issues decided by the magistrate were within the court's discretion. *Id.* at 1016–17. Thus, the court unanimously affirmed the decision of the trial court denying post-conviction relief. Rouster did not file a petition for writ of certiorari to the United States Supreme Court after either his direct appeal or his appeal of the denial of post-conviction relief.

## II. Standard of Review

■ A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume

is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determina-

tion of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential standard for evaluating state court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Supreme Court handed down an opinion further explaining the application of the AEDPA on April 18, 2000, in *Terry Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[5] *Terry Williams* specifically addresses the application of the "contrary to, or involved an unreasonable application of, clearly established law" language from the AEDPA in the *Strickland* context. 120 S.Ct. at 1499. In a divided opinion, Justice O'Connor delivered the opinion of the court regarding the appropriate interpretation of that clause. *Id.* at 1516. Specifically, the court held that "contrary to" and "involved an unreasonable application of" clauses of the statute have independent meaning. *Id.* at 1519. The court defined "contrary to" as an instance where the state court "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20. The court held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. Concluding the section of her opinion defining the statute, Justice O'Connor stated as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 1523.

It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as defined by Justice Scalia in *Castille v. Peoples*, 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke*, 148 F.3d 705 (7th Cir.1998), the Seventh Circuit explained that:

A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits.... [Because] the state courts did not address Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full

---

5. The United States Supreme Court also issued an opinion in *Michael Wayne Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) on April 18, 2000. While that opinion also addresses the AEDPA, it primarily concerns the need for an evidentia-

ry hearing in the federal district court. As such has not been requested here, this order will not discuss that case. It will, however, differentiate the two *Williams* cases by using the first names of the petitioners therein.

and fair opportunity to review his claims." *Id.*, citing *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary,* 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

Several of Rouster's claim before this court assert ineffective assistance of counsel at trial. That claim is considered under the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984). In order to prevail on this claim, Rouster must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were out-

side the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

■ There is no question after *Terry Williams* that *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) "qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Terry Williams,* 120 S.Ct. at 1512. Additionally, it is clear that the Indiana Supreme Court has not decided this issue in a manner "contrary to ... clearly established Federal law." The Indiana Supreme Court followed the dictates of *Strickland,* quoting as follows:

> A deficient performance is a performance that falls below an objective standard of reasonableness. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Douglas v. State,* 663 N.E.2d 1153 (Ind.1996). Prejudice exists when a defendant/petitioner shows "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

*Rouster v. State,* 705 N.E.2d at 1003. As the Indiana Supreme Court clearly bases its analysis of ineffective assistance of counsel claims under the two-part test of *Strickland,* this court cannot find that the Indiana Supreme Court's analysis is contrary to clearly established Federal law. Thus the question for this court is whether the Indiana Supreme Court's decision affirming the denial of Rouster's petition for post-conviction relief "involved an unreasonable application of" *Strickland.*

### III. Severance Issues

#### A. Severance Prior to Trial

■ Rouster's first major claim is that his counsel provided ineffective assistance

because he failed to move for severance from the other defendants prior to trial. As noted above, the Indiana Supreme Court found that the failure to obtain a severance prior to trial did not prejudice Rouster. *Rouster v. State*, 705 N.E.2d 999, 1005 (1999). In *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the United States Supreme Court held that United States District Courts should grant motions for severance when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539, 113 S.Ct. 933. The Seventh Circuit explained in *United States v. Clark*, 989 F.2d 1490 (7th Cir.1993) that the defendant must show that he "could not possibly have a fair trial without severance." *Id.* at 1499. That court listed four circumstances which require severance: "1) conflicting and irreconcilable defenses; 2) a massive and complex amount of evidence that makes it almost impossible for the jury to separate evidence as to each defendant; 3) a codefendant's statement that incriminates the defendant; and 4) a gross disparity of evidence between the defendants." *Id. Zafiro* explained the first of those circumstances by holding that joinder is prejudicial "when the evidence or testimony offered by one defendant is truly irreconcilable with the innocence of a codefendant." 506 U.S. at 543, 113 S.Ct. 933.

Rouster argues that the facts of the trial prove the defenses of Rouster and Williams to be so conflicting and irreconcilable that the failure to sever was highly prejudicial to Rouster. He points to the closing argument by Williams' counsel, in which counsel depicted Rouster as "an individual who went beserk [sic], an individual who wanted to settle his score, an individual who is seeking in his own mind some kind of vengeance." T.R. 2529. Rouster's counsel then argued in closing that Rouster could not have killed Mr. Rease because his blood was on Rouster's back, and no blood from Mrs. Rease was found on Rouster. T.R. 2564–65. He further suggested that Williams must have been the killer because he had blood from both Reases on the front of his shorts. T.R. 2565–67. Under the trial court's unusual procedures, Williams' counsel was then allowed rebuttal argument, during which he told the jury that blood was found on Rouster's clothing consistent with both Reases. T.R. 2594.

The Indiana Supreme Court first noted that both Rouster and Williams had presented alternative defenses that the jury could have acquitted each of them on without impacting the other's defense: Rouster had argued intoxication and Williams had argued reasonable doubt. 705 N.E.2d at 1005. Additionally, the court found that even if severance was appropriate, Rouster had not been prejudiced.

> Moreover, there is no reasonable probability that the results at the guilt phase of trial would have been different if a separation had occurred. First, each codefendant's arguments regarding who pulled the trigger were actually of little relevance since both were convicted of felony murder under IND.CODE § 35–42–1–1. All participants in a robbery or attempted robbery that results in killing by one robber are deemed equally guilty of murder, regardless of which participant actually killed the victim. *Rogers v. State*, 262 Ind. 315, 315 N.E.2d 707 (1974). Additionally, the same evidence would have been admitted against Rouster even if he had been granted a separate trial. Such evidence includes testimony that Rouster said, "I killed the [mfs]" to his co-defendant Teresa Newsome shortly after shots were heard inside the Rease home, (T.R. at 890–91); Derrick Bryant's testimony that he heard Rouster tell Williams, "[B]ring them both back here" before he heard Henrietta Rease say, "Greg, why are you doing this?" followed by two shots, (T.R. at 2040–41); plus the physical evidence of the blood consistent with that

of John Rease found on Rouster's shoes, socks, and vest. Considering the amount of corroborating evidence indicating Rouster's role in the crime, Rouster was not prejudiced by his counsel's failure to move for separate trials.

705 N.E.2d at 1005. The respondent here argues that this decision was not an unreasonable application of *Strickland,* and thus Rouster is not entitled to relief under this claim.

This court agrees with the determination of the Indiana Supreme Court on this issue. While Rouster's counsel's failure to move for severance was unwise at best, and possibly an example of deficient performance, this court is convinced that no prejudice sprung from the failure to sever the guilt/innocence portion of the trial. There is no doubt in this court's mind that Rouster would have been convicted, whether tried separately or jointly with Williams, given the testimony of three difference witnesses, including his girlfriend Newsome, that Rouster admitted he had "killed the motherfuckers," the number of witnesses who identified Rouster as being at the Rease home that evening, and the blood on Rouster's clothing. In *Hernandez v. Cowan,* 200 F.3d 995 (7th Cir.2000), the Seventh Circuit held that prejudice exists if "there was a reasonable probability that the severance would have made a difference to the outcome of the trial." 200 F.3d at 999. This court cannot find that severance would have made a difference to the outcome of the guilt phase, and thus no prejudice resulted from Rouster's counsel's failure to file a motion for severance prior to trial.

**B. Severance at the End of Trial**

■ Rouster further argues his trial counsel's failure to move for severance at the close of the guilt phase denied him an individualized sentencing hearing as required by the Fourteenth Amendment to the United States Constitution. In a string of cases decided in the late 1970s and early 1980s, the United States Supreme Court held that the Eighth and Fourteenth Amendments require individualized consideration of the character of the individual and the nature of the offense in capital cases. *See, Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The *Woodson* court specifically held that "the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of a particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson,* 428 U.S. at 304, 96 S.Ct. 2978. These cases all dealt specifically with the issue of consideration of mitigation evidence in general during the required penalty phase of the trial. The Supreme Court has not addressed the issue of severance during the penalty phase as a requirement of the Eighth and Fourteenth Amendments in this context. Three state courts have held that severance of defendants was required during the penalty phase when the defendants had mutually antagonistic defenses. *See Foster v. Commonwealth,* 827 S.W.2d 670 (Ky.1991), *McDaniel v. State,* 278 Ark. 631, 648 S.W.2d 57 (1983) and *Lafevers v. State,* 819 P.2d 1362 (Okla.Crim.App.1991).

The Indiana Supreme Court held on this issue as follows:

The key to whether the trial court should consider a motion to separate trials filed at the close of evidence is thus whether a previously unknown ground, or a known but newly relevant ground, causes a separate trial to become necessary for a fair determination of the defendant's guilt or innocence. Here, no evidence different from that which we have already considered in our previous section on whether trial counsel should have filed a motion to separate could have been offered by Rouster.

*See* discussion *supra* Part I.A.1. Accordingly, our conclusions regarding Rouster's arguments are the same and counsel was not deficient, nor was Rouster prejudiced, by counsel's omission in failing to file a motion to separate trials before sentencing.

705 N.E.2d at 1007–08. Rouster argues that the Indiana Supreme Court failed to analyze the issue under appropriate United States Supreme Court precedent as established in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

Rouster argues that some witnesses, specifically Theresa Newsome and other members of the Williams family, who could have testified on Rouster's behalf in a separate proceeding, instead chose to testify only for Darnell Williams; presumably Rouster's counsel was also ineffective for failing to subpoena any of these potential witnesses. Additionally, there was evidence presented about a similar armed robbery which Williams, but not Rouster, had participated, and Rouster argues that the jury's decision about Rouster might have been tainted by that information on Williams. He further suggests that because Williams had some mitigating evidence which Rouster did not have—evidence of a job and kindness to his relatives—Rouster looked less worthy in comparison. Williams' counsel attacked some of Rouster's mitigation evidence as aggravating, suggesting that his mental and emotional disturbance caused by his deprived background was the reason to find Rouster responsible. Additionally, both Williams' and Rouster's counsel argued the other defendant was the triggerman, trying to prove the aggravating circumstance against the other defendant. Finally, even the Indiana Supreme Court acknowledged in Williams'

case that the "true extent [of his participation in the killings] may never be known," making clear the jury could not fully consider the individual participation of each defendant. *Williams v. State,* 706 N.E.2d 149, 156 (1999). Rouster's counsel admitted during PCR that the option of moving for severance at the sentencing hearing "did not even occur to me." P.C.R. 2341–42.

While there is certainly a quantity of evidence to suggest that the jury's task was made more difficult because the defendants were not severed during the penalty phase, this court is not persuaded that the jury was unable to give individualized attention to each defendant's character, history, and the offense in question. While the Supreme Court has mandated individualized consideration of the mitigating and aggravating circumstances in determining the appropriateness of the death sentence, it has never discussed the necessity of severing penalty phases to provide that individualized consideration in joint trials. Thus, this claim is not a "straightforward application of established rules." *Liegakos v. Cooke,* 106 F.3d 1381, 1388 (7th Cir. 1997). Additionally, Rouster did not raise this claim in this posture before the Indiana Supreme Court, and thus this court finds it slightly disingenuous for Rouster to complain that the Indiana Supreme Court did not consider this issue under the appropriate standard, when Rouster did not suggest this standard in his brief. This court finds that the Indiana Supreme Court's determination that Rouster's counsel was not ineffective for failing to move for severance prior to the penalty phase was not an objectively unreasonable application of *Strickland,* and thus, under *Williams v. Taylor,* 120 S.Ct. at 1504, this court cannot grant the relief requested on this claim.

## IV. Other Ineffective Assistance Claims

### A. Failure to Present Self-Defense Argument

■ Rouster next argues that his trial counsel was ineffective for failing to pres-

ent experts who could have presented a reasonable probability that he did not commit felony murder, but rather that his actions were self defense. Rouster claims that a number of facts presented during post-conviction relief support his claim of a possible self-defense claim, including the testimony of neighbors who observed John Rease displaying guns in front of children, P.C.R. 2118–19, 2231–32; evidence that Rouster went in and out of the Rease home more than once during the incident, P.C.R. 1792–94; the lack of any money or property of the Reases' found on Rouster; evidence that the Reases were both armed; evidence that Rouster was outside the house when Mrs. Rease was shot, T.R. 3027; evidence that the Reases died of contact wounds, and the failure of the state to order a gun residue test on the deceased or the defendants. P.C.R. 1627–29.

Rouster argues that the use of expert testimony combined with this evidence would have supported his claim of self-defense under the prosecution's theory of the case. The .32 caliber pistol used to kill Mr. Rease and to shoot Mrs. Rease in the abdomen was the Reases' own gun. T.R. 3023, 3025. Further, the prosecution argued that Darnell Williams killed Mrs. Rease execution-style with the .22 while Rouster was outside. T.R. 3027. A reconstruction expert, suggests Rouster, could have shown that the shots fired from the .32 pistol were evidence of self-defense, based on the trajectory of the bullet path. Both trial counsel agreed they would have used the report of the reconstruction expert had they had such a report. Thus Rouster argues that trial counsel were ineffective for failing to seek the funds to hire a reconstruction expert to support a self-defense theory of the case.

The Indiana Supreme Court, considering this case on review of the denial of post-conviction relief, wrote the following about this issue.

Rouster argues that trial counsel were ineffective for failing to present expert evidence to show the killings were com-

mitted in an act of self-defense. Self-defense is not available, however, as an affirmative defense when one is engaged in the commission of a robbery. IND. CODE ANN. § 35–41–3–2(d)(1) (West 1986). Rouster's proposed evidence (expert testimony meant to indicate the Reases' wounds were consistent with shots fired in self-defense) does not affect the evidence necessarily believed by the jury beyond a reasonable doubt that Rouster and Williams were both engaged in robbery at the time the killings occurred. Thus, even if we assume Rouster was indeed acting to protect himself (an assumption that is belied by virtually all of the evidence), he is barred from asserting self-defense since the jury found he was engaged in robbery at the time of the killings. Trial counsel were not ineffective for failing to offer self-defense evidence.

705 N.E.2d at 1006. The respondent thus argues that because the defense was unavailable by statute, the failure of trial counsel to present any evidence on that point could not be ineffective.

Rouster argues that the Indiana Supreme Court's position on this issue is contrary to and an unreasonable application of *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). In that case, the United States Supreme Court stated as follows:

'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.' [*In re Oliver*] 333 U.S.[257] at 273, 68 S.Ct. [499] at 507 [92 L.Ed. 682 (1948)] (footnote omitted).

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the

facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 18–19, 87 S.Ct. 1920. *Accord, Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

This constitutional argument, first made in Rouster's memorandum in support of his petition, filed August 8, 2000, asserts that the Indiana Supreme Court's analysis of his claim is contrary to Rouster's right to present a defense, as enunciated in *Washington*. However, there is no evidence to suggest that had Rouster's trial counsel attempted to show such a defense, the court would have denied Rouster the right to try to prove self-defense. In *Debose v. State*, 450 N.E.2d 71 (Ind.1983), the Indiana Supreme Court affirmed a trial court's denial of post-conviction relief where the petitioner had challenged his trial counsel's failure to offer a self-defense instruction. The petitioner had given some testimony to suggest that he had only taken money which was owed to him from the victim. 450 N.E.2d at 72. The Indiana Supreme Court held that "it was up to the jury to weigh this conflict in the evidence," even though the same statute prohibiting self-defense as a defense to robbery was on the books. The Indiana courts would not disallow the defense to be made had it been raised by counsel; the Indiana Supreme Court was merely stating that it was not ineffective to not raise a defense that was prohibited by statute. This court does not find that decision to be contrary to or an unreasonable application of the relevant United States Supreme Court precedent, and thus, habeas relief is inappropriate on this claim.

### B. Failure to Adequately Present Mitigation Evidence

■ Rouster next argues that his counsel was ineffective for failing to completely investigate all of the necessary explanatory mitigating evidence. Rouster argues that competent counsel would have further investigated Rouster's background to discover the following facts: that his mother was a heroin user during her pregnancy with Rouster, P.C.R. 591–92; that his mother had attempted to abort him early during her pregnancy, P.C.R. 600–01; that his birth was complicated by severe breathing difficulties, P.C.R. 625–26; that he was placed in an unlicensed foster home which was unsupervised during the first four years of his life, resulting in significant speech difficulties for Rouster, P.C.R. 626–68; that Rouster had frontal lobe damage which impaired his ability to exercise voluntary control over certain behaviors and caused impulsivity consistent with attention deficit disorder, P.C.R. 650–51, 1702–05; and that petitioner suffered learning disabilities which were not diagnosed during his childhood, P.C.R. 624–51.

Trial counsel admitted that they did not use experts to assist them with mitigation issues, and in fact stated that they had never used outside experts for capital sentencing prior to Rouster's case. P.C.R. 2307–09, 2414–16. Trial counsel did not have experts test Rouster to help them understand the inconsistencies in his I.Q. scores and grades during his school career, nor did they obtain Rouster's mother's prenatal records and Rouster's birth records to see if any damage had occurred at birth. Therefore, Rouster argues that his counsel's failure to adequately investigate or obtain the listed information was a deficient performance which prejudiced him in the sentencing proceeding.

The Indiana Supreme Court, after considering this issue, held as follows:

During sentencing, trial counsel did note several times, however, that Rouster was emotionally disturbed. Counsel also referred the jury to opinions given earlier at trial by members of the Department of Public Welfare which stated Rouster was emotionally disturbed.

The additional testimony offered by the petitioner during post-conviction would have given the jury neither additional nor crucially different information. Based on this information and the findings of the post-conviction court, we conclude counsel's performance was not deficient for failing to offer additional mitigating evidence about Rouster's mental state.

705 N.E.2d at 1006–07. Respondent argues that counsel is not required "to investigate the defendant's past with the thoroughness of a biographer." *Stewart v. Gramley,* 74 F.3d 132, 135 (7th Cir.1996) *cert. denied,* 519 U.S. 838, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996). Then–Chief Judge Posner explained in *Stewart* that "the lawyer must make a 'significant effort, based on reasonable investigation and logical argument,' to mitigate his client's punishment." *Id.,* citing *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.1989). The respondent argues that such was done here, and the Indiana Supreme Court's resolution of the issue was not objectively unreasonable under *Strickland,* thus barring relief to Rouster.

Rouster cites *Brewer v. Aiken,* 935 F.2d 850 (7th Cir.1991) for the proposition that the failure to fully develop mitigation evidence can support a grant of habeas relief. However, in *Brewer,* the trial counsel completely failed to present any evidence of Brewer's low intelligence and passive personality. 935 F.2d at 858. Rouster also cites *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) to support his assertion that the failure to present testimony in mitigation must be part of the trial strategy of counsel. In *Burger,* trial counsel did not present any evidence in mitigation on the petitioner's unfortunate childhood, but he later testified that he withheld this evidence because it detracted from his overall strategy that petitioner was under the influence of another and might have allowed damaging cross-examination about petitioner's criminal history. 483 U.S. at 791, 107 S.Ct. 3114.

Finally, Rouster compares his case with that of *Terry Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In *Williams,* counsel presented the testimony of the defendant's mother and two neighbors in mitigation. 120 S.Ct. at 1500. During post-conviction, evidence was presented to show that trial counsel failed to investigate and discover Williams' abusive upbringing and his mental impairments. *Id.* at 1513–15. The Supreme Court held that the failure to present the additional mitigation evidence to the jury might have influenced the jury's decision, regardless of the strength of the prosecution's case. *Id.* at 1515–16. In this case, while trial counsel could certainly have done a better job at presenting mitigation evidence, they did present Rouster's case file from his life as a ward of the state, which included several references to his low intelligence and learning difficulties. The Indiana Supreme Court found that the additional evidence presented during the post-conviction proceedings was informative, but primarily cumulative of the mitigation evidence proffered at trial. 705 N.E.2d at 1007. This court does not find that conclusion to be an unreasonable application of *Strickland,* and thus, will deny Rouster relief on this claim.

### V. Jury Instruction Issues

#### A. Unanimity in Mitigating Circumstances

■ Rouster finally argues that several of the jury instructions were incorrect and the failure of his trial counsel to submit proper instructions constituted ineffective assistance of counsel. He first complains that no instruction was given to let the jury know that it did not need to find a mitigating circumstance beyond a reasonable doubt to consider it in their deliberations. In *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Supreme Court held the Maryland death penalty statute unconstitutional because a jury instruction during the penalty phase suggested that mitigating circumstances could not be considered unless the jury

unanimously found the circumstance to be present. In *Mills*, jurors were given a form which stated "based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist...." 486 U.S. at 387, 108 S.Ct. 1860. Similarly, the United States Supreme Court struck down the North Carolina capital sentencing scheme where the jurors were asked on their verdict form "do you unanimously find from the evidence the existence of one or more of the following mitigating circumstances?" *McKoy v. North Carolina*, 494 U.S. 433, 436, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

The Indiana Supreme Court considered this issue and ruled as follows:

> We are satisfied the jurors were not misled. Only the court's final instruction mentioned unanimity, stating, "[y]our verdict must be unanimous." (T.R. at 176A.) Other instructions given at the sentencing phase indicated to jurors that they, individually, were responsible for considering the evidence. (See Instructions 8 & 9, T.R. at 172A, 173A.) Only an instruction to jurors which explicitly directed them to consider Rouster's mitigating factors independently, and directed them that they were not required to find such factors unanimously before considering them in their aggravating/mitigating factors balancing, would have been less ambiguous. [FN13] We do not believe that any reasonable juror could have concluded that she was obligated to unanimously agree upon mitigating factors with her fellow jurors before she could consider them in her balancing process.

705 N.E.2d at 1012. The Indiana Supreme Court considered the appropriate United States Supreme Court standards in determining that the instructions did not require unanimity in determining mitigating circumstances, and this court does not find that decision to be an unreasonable application of Supreme Court law. Therefore, no relief will be granted on this issue.

## B. Intoxication Instruction in Penalty Phase

■ Rouster next claims that trial counsel erred in failing to request an instruction at the penalty phase that intoxication could negate the intent requirement of two aggravating factors; specifically, the aggravating factors listing the intentional killings of John and Henrietta Rease during a robbery. The Indiana Supreme Court, in considering this issue, held as follows:

> The intoxication defense cannot prevail if evidence shows the defendant had the ability to perform tasks such as attempting to hide his crime, giving instructions to others, or taking himself from place to place immediately following the crime. *Montgomery v. State*, 521 N.E.2d 1306 (Ind.1988). The evidence here shows that Rouster was able to perform physical and mental acts to such an extent that it is extremely unlikely the jury would have found Rouster so intoxicated that he was unable to engage in intentional acts.

705 N.E.2d at 1009. The court then reviewed the evidence to suggest Rouster would not have been found intoxicated by the jury, before ultimately stating:

> Rouster was able to deliberate, communicate, and then act towards a chosen end. Given evidence that Rouster was in control of his faculties and the lack of evidence that Rouster was intoxicated to the extreme level necessary to provide an affirmative defense, we conclude that the trial court would have refused an intoxication instruction and that counsel was thus not deficient for failing to tender one.

*Id.* at 1010 (footnote omitted).

Rouster argues that bus driver Donna Thomas testified she smelled alcohol on his breath. T.R. 1167. Trooper Rodney Means testified he appeared intoxicated, had slurred speech and dull reaction, and probably could not have passed a breathalyzer. T.R. 1092–93, 1106, 1108. Edwin

Taylor testified he assumed Rouster was "drunk and did not know what [he was] doing." T.R. 2765. Jimmy Gray testified that he saw Rouster drinking from a 40–ounce bottle of malt liquor. T.R. 1533–34.

Respondent argues that the jury was given an instruction on the intoxication defense in the guilt phase and was given an instruction on intoxication as a mitigating factor during the sentencing phase; thus, if the jury did not find Rouster too intoxicated to form the intent to rob during the guilt phase, they would not have found him too intoxicated to form the intent to kill during the penalty phase.

This court finds that the jury was properly instructed on this issue. Because it was not likely that the trial court would have granted an intoxication instruction had one been offered, the failure to offer such was not ineffective assistance of counsel. The Indiana Supreme Court's holding was not an unreasonable interpretation of *Strickland*, and thus, the request for relief is denied.

### C. Alternative Sentence Instruction

■ Rouster finally argues that the following instruction was misleading to the jury on the issue of Rouster's potential sentence:

> In the state of Indiana, if the death penalty is not imposed, the sentence for murder is a fixed sentence of from thirty (30) to sixty (60) years. The presumptive penalty is forty (40) years. The court at sentencing imposes a specific number of years within that range.

> In the state of Indiana a defendant can earn credit for good behavior to apply against the sentence, with a maximum allowable credit of fifty (50%) of the sentence imposed by the Court.

T.R. 175A. Rouster argues that the failure to explain that he could be sentenced separately on each count, or sentenced consecutively, misled the jury into possibly believing that he could be out in fifteen years.

The Indiana Supreme Court, in considering this claim, held that:

> In *Simmons* [*v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) ], the Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.* at 156, 114 S.Ct. 2187. Rouster reads this case for the broad proposition that a defendant's due process rights are violated whenever there is a possibility a defendant may be sentenced to death and the jury is not instructed on the possibility of concurrent or consecutive sentences.

> Rouster's argument is unavailing. *Simmons* was handed down more than a year after we decided Rouster's case on appeal. Because *Simmons* was unavailable to either Rouster's trial or appellate counsel, we cannot say their respective performances were deficient for their failure to make a claim based on *Simmons*, even if we accept Rouster's reading of that case.

705 N.E.2d at 1011. This court concurs with the conclusion of the Indiana Supreme Court that the failure to suggest this instruction was not ineffective assistance, and thus that court's decision was a reasonable application of *Strickland*. Therefore, no relief is available on this claim.

### VI. Conclusion

As the evidence more than supports the conclusion that the Indiana Supreme Court reasonably applied the standards of *Strickland v. Washington*, in reviewing the performance of counsel in this case, this court cannot find a violation of 28 U.S.C. § 2254. Thus, the petition for writ of habeas corpus is now **DENIED.**

**IT IS SO ORDERED.**